# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-1485

_____

Melvin Wallace; Shirley Hardt; Lewis Simpson; William Cobb; Erica
Davis-Holder; Rotem Cohen; Julian Wagner; Rose Wagner; Erin Stilwell; Maria
Eugenia Saenz Valiente; Adam Burnham, individually and on behalf of all others
similarly situated

*Plaintiffs - Appellants*

v.

ConAgra Foods, Inc., doing business as Hebrew National, a Delaware corporation

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: December 19, 2013
Filed: April 4, 2014

_____

Before RILEY, Chief Judge, WOLLMAN and LOKEN, Circuit Judges.

_____

RILEY, Chief Judge.

Melvin Wallace and several other named consumers (collectively, consumers)
claim some Hebrew National beef products are not, as the label reads, "100%
kosher." Seeking to represent a class consisting of all Hebrew National buyers in the

United States over a multi-year period, the consumers sued Hebrew National's parent corporation, ConAgra Foods, Inc. (ConAgra), in Minnesota state court, alleging numerous violations of state law.[1] As their purchase and consumption of the Hebrew National brand products was not motivated by faith, the consumers do not assert any personal religious injury. Instead, the consumers aver ConAgra's representations that kosher is the "New Organic," a promise of food purity amid other products full of artificial ingredients, led them to pay an unjustified premium for Hebrew National's ostensibly kosher beef.

ConAgra first removed to federal court, invoking the Class Action Fairness Act of 2005 (CAFA), 28 U.S.C. § 1453, then moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) and (6), contending the consumers lacked Article III standing and the district court lacked jurisdiction to address religious questions underlying the consumers' claims. Without addressing standing, the district court decided the First Amendment prohibits the courts from adjudicating the consumers' legal claims and, without noting 28 U.S.C. § 1447(c), dismissed the case with prejudice. The consumers appeal. Because the consumers lack traditional Article III standing to pursue this case, we vacate the district court's judgment, reverse the prejudicial dismissal, and instruct the district court to remand this case to state court as required by 28 U.S.C. § 1447(c).

## I.    BACKGROUND

### A.    Factual Allegations

The consumers premise their suit on the following allegations, which we accept as true at this juncture. ConAgra manufactures Hebrew National meat products (notably hot dogs) using beef slaughtered by AER Services, Inc. (AER). The

---

[1]The consumers assert counts for negligence; violation of the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301 et seq.; violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601 et seq.; violation of multiple other state consumer protection laws; and breach of contract.

slaughtering takes place in the facilities of another entity, American Foods Group, LLC (AFG), which sells meat classified as kosher to ConAgra and sells any remaining meat to third parties. AER employs the religious slaughterers who perform the "shechitah" (i.e., the ritual slashing of the cow's throat) along with the other individuals responsible for marking particular meat as kosher. One such individual is supposed to inspect the freshly slaughtered carcass while another examines the lungs for signs of injury. If a lung cannot hold air because, for example, there is a small perforation, the meat should be deemed non-kosher. A third party kosher certification entity named Triangle K, Inc., nominally monitors whether AER, AFG, and ConAgra comply with the kosher rules. Triangle K is a for-profit New York company owned and run by Ayreh Ralbag, an orthodox rabbi.

ConAgra promotes these kosher requirements as a reason to purchase Hebrew National products, which cost more than similar non-kosher competitors. As American consumers sought purer foods prepared in accordance with strict safety standards, the kosher food industry expanded by catering to non-religious consumers. Like the consumers bringing this case, an increasing number of Americans chose to pay more for Hebrew National's supposedly kosher products based on ConAgra's representations that the kosher label was a guarantee of quality and superior taste.

Each Hebrew National package says the contents are "Made With Premium Cuts of 100% Kosher Beef." ConAgra says Hebrew National "answer[s] to a higher authority" and sells only products that "meet a higher standard." ConAgra reported "[t]he Kosher trend is . . . gaining momentum as more people come to understand the quality connection associated with the Kosher seal – which certifies both high-quality ingredients and processes that meet strict Kosher standards." Hebrew National's director of marketing declared "[f]oods like Hebrew National's 100 percent kosher beef franks give parents quality assurance and purity of ingredients they can trust."

Yet, according to the consumers, "manufacturing quotas—not kosher rules—are the deciding factor as to whether any batch of meat harvested at the AFG slaughterhouses is ultimately designated as kosher or non-kosher." Employees face such pressure to meet a quota of approximately 70% for kosher meat that "the kosher inspection process becomes defective and unreliable" and some "meat from cows that should not qualify for kosher certification ends up being marked kosher and used in Hebrew National products."

## B.     Procedural History

This case began as a state class action filed in Minnesota state court. ConAgra removed to federal court in the District of Minnesota, then moved for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6). Although ConAgra itself first invoked federal jurisdiction, ConAgra submitted that the federal district court lacked subject matter jurisdiction because (1) the consumers' claims were "barred" by the First Amendment, and (2) the consumers lacked Article III standing. The district court granted ConAgra's motion under Rule 12(b)(1), reasoning the First Amendment stripped the federal courts of subject matter jurisdiction over the consumers' state law claims. The district court believed that "the determination of whether a product is in fact 'kosher[]' [is] intrinsically religious in nature," so adjudicating this case "would necessarily intrude upon rabbinical religious autonomy." Finding "it lack[ed] the requisite subject matter jurisdiction to preside over th[e] dispute," the district court dismissed the case with prejudice. The consumers now appeal.

## II.     DISCUSSION

It is a foundational principle in our legal system, enunciated by Justice Brandeis in a familiar concurrence, that courts must make every effort to avoid deciding novel constitutional questions. See Ashwander v. TVA, 297 U.S. 288, 345-47 (1936) (Brandeis, J., concurring). "It is not the habit of the court to decide questions of a constitutional nature *unless absolutely necessary to a decision of the*

-4-

*case*." Burton v. United States, 196 U.S. 283, 295 (1905) (emphasis added). A corollary to Burton's cardinal rule is that if a case may be resolved on easy and settled constitutional grounds, the court should do so instead of deciding the case on difficult and novel constitutional grounds. See, e.g., Ashwander, 297 U.S. at 346 (Brandeis, J., concurring). "[C]ourts should think hard, and then think hard again, before turning small cases into large ones." Camreta v. Greene, 563 U.S. ___, ___, 131 S. Ct. 2020, 2032 (2011). Rather than rushing to decide a difficult First Amendment question of first impression in this circuit, we begin with "the threshold jurisdictional question: whether" the consumers "ha[ve] standing to sue." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102 (1998).

## A.     Article III Standing

Considering the question de novo, see, e.g., Red River Freethinkers v. City of Fargo, 679 F.3d 1015, 1022 (8th Cir. 2012), we conclude the consumers lack traditional Article III standing.

### 1.      Economic Injury in Fact

ConAgra initially argues the consumers lack Article III standing because they suffered no "concrete and particularized injury." According to ConAgra, the consumers' failure to allege "that they keep kosher" is fatal to their case. The consumers retort that the factual injury they allege was pecuniary, not religious: they claim to have "paid a premium price for a deceptively marketed product that failed to meet the manufacturer's guarantee." On this point, ConAgra's argument is little more than a dispute over how best to read the consumers' complaint in the light most favorable to the consumers. If the consumers' complaint is accepted as true, the consumers may have paid too much for Hebrew National products based on ConAgra's misleading representations. When the alleged harm is "economic," "the 'injury in fact' question is straightforward." Hein v. Freedom From Religion Found., Inc., 551 U.S. 587, 642 (2007) (Souter, J., dissenting); accord, e.g., Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 184 (2000) (holding

plaintiffs had standing because their "economic interests" were "directly affected"); Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cnty., 115 F.3d 1372, 1379 (8th Cir. 1997) (concluding even "indirect" financial harm "constitutes an injury in fact"). The consumers' alleged economic harm—even if only a few pennies each—is a concrete, non-speculative injury. ConAgra's argument on this point must fail.

## 2.    Particularized, Actual Injury in Fact

Yet ConAgra has another standing challenge—this one well founded. ConAgra argues that even if the consumers would have overpaid if the Hebrew National products they bought were not actually kosher, the consumers "have not alleged that the products they each purchased were defective." ConAgra analogizes this to a product defect case in which some products are admittedly defective, but most are not. The consumers' allegations do not establish that *all* or even *most* Hebrew National products were not kosher, which means the particular packages of processed beef they purchased may have been—and indeed more than likely were—prepared in accordance with minimum kosher standards.

Article III requires "an injury [to] be concrete, *particularized*, and *actual* or imminent." Monsanto Co. v. Geertson Seed Farms, 561 U.S. ___, ___, 130 S. Ct. 2743, 2752 (2010) (emphasis added). An alleged injury cannot be "too speculative for Article III purposes." Lujan v. Defenders of Wildlife, 504 U.S. 555, 564 n.2 (1992). If there is no "actual" harm, then there must at least be an "*imminent*" harm. Id. As the Supreme Court emphasized just last year, "mere speculation" that injury did or might occur "cannot satisfy the requirement that any injury in fact must be fairly traceable to" the alleged source. Clapper v. Amnesty Int'l USA, 568 U.S. ___, ___, 133 S. Ct. 1138, 1148 (2013).

The consumers' allegations fail to show that any of the particular packages of Hebrew National beef they personally purchased contained non-kosher beef. The consumers frankly admit that "it is impossible for any reasonable consumer to detect"

whether purportedly kosher meat is non-kosher.  Instead, the consumers pin their Article III hopes on the allegation that they "paid a premium price for the Hebrew National products purchased believing them to be 100% strictly kosher, when they weren't."  The consumers maintain this general allegation, that the non-kosher status of *some* packages of beef tainted *all* Hebrew National's products, means they "are not required to allege the *specific products or packages* that failed to meet the represented standard."  (Emphasis added).

The consumers' argument is inconsistent with Article III.  The Supreme Court has made it clear that standing must be particularized, meaning the alleged "injury must affect the plaintiff in a *personal and individual* way."  Lujan, 504 U.S. at 560 n.1 (emphasis added).  In the context of defective products, "it 'is not enough' for a plaintiff 'to allege that a product line contains a defect or that a product is at risk for manifesting this defect; rather, the plaintiffs must allege that *their* product *actually exhibited* the alleged defect.'"  In re Zurn Pex Plumbing Prods. Liab. Litig., 644 F.3d 604, 616 (8th Cir. 2011) (emphasis added) (quoting O'Neil v. Simplicity, Inc., 574 F.3d 501, 503 (8th Cir. 2009)).

Without any particularized reason to think the consumers' own packages of Hebrew National beef actually exhibited the alleged non-kosher defect, the consumers lack Article III standing to sue ConAgra.  Accepting the consumers' various allegations, it remains entirely possible, maybe probable, that the packages of beef they personally purchased and consumed met the "strict" standards advertised by ConAgra.  Even supposing the 70% kosher quota meant some beef was improperly certified as kosher, the consumers give no reason to think *all* the beef marked as kosher under the quota did not meet kosher standards.  As we cannot discern from the complaint how many packages were tainted with non-kosher beef, it is unclear

whether even a bare majority of Hebrew National packages were not kosher.[2] Which means, it is pure speculation to say the particular packages sold to the consumers were tainted by non-kosher beef, while it is quite plausible ConAgra sold the consumers *exactly what was promised*: a higher quality, kosher meat product. Time and again the Supreme Court has reminded lower courts that speculation and conjecture are not injuries cognizable under Article III. See, e.g., Clapper, 568 U.S. at ___, 133 S. Ct. at 1148.

### 3.     Injury in Law

The consumers' effort to distinguish their case from a mine-run product liability case is unconvincing: "'Ah, but this is not a products-liability case!' So plaintiffs respond." In re Bridgestone/Firestone, Inc., 288 F.3d 1012, 1016 (7th Cir. 2002). The consumers "describe the injury as financial rather than physical and seek to move the suit out of the tort domain and into that of contract (the [product] was not the flawless one described and thus is not merchantable, a warranty theory) and consumer fraud (on the theory that selling" beef products that *might* not be kosher, "and thus worth less than represented, is fraudulent)." Id. at 1017. Article III cannot be so easily fooled.

Viewing the consumers' argument most charitably, the argument proceeds in three steps. First, multiple states have created causes of action that do not require a particularized showing of individual injury to recover. Second, Congress extended federal jurisdiction to these causes of action under CAFA. Third, CAFA's extension of federal jurisdiction to these state causes of action means the consumers need only

---

[2]For example, even if only half of all cows processed by AER and AFG met kosher standards (meaning 20% of all cows were marked improperly) five out of every seven cows *marked as kosher* would still *be kosher*. For most of the beef labeled as kosher not to be kosher, in fact, one would have to assume fewer than 35% of all cows processed by AER and AFG met kosher requirements—an assumption for which there is no basis in the complaint.

show a bare statutory violation—injury *in law* rather than an injury *in fact*—to satisfy Article III. Assuming the first step is correct (an assumption we make to avoid unnecessary analysis of state law), we are not convinced by the consumers' argument at the other two steps.

To interpret CAFA as a congressional attempt to extend federal jurisdiction to cases involving no injury *in fact* would force us to presume—without any basis in the statutory text, see 28 U.S.C. § 1453, and in contradiction to long-settled constitutional precedent, see, e.g., Lujan, 504 U.S. at 560—that Congress intended to stretch, if not breach, the constitutional limits on federal jurisdiction. We never assume the people's elected representatives would so casually disregard the Constitution they have sworn to uphold. See, e.g., Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988). To the contrary, recognizing that "Congress is predominantly a lawyer's body," we "assume that our elected representatives . . . know the law." Albernaz v. United States, 450 U.S. 333, 341 (1981) (omission in original) (internal quotations omitted). Our "respect for Congress" also leads us to "assume [Congress] legislates in the light of constitutional limits." Rust v. Sullivan, 500 U.S. 173, 191 (1991). For these reasons, "[w]ithout the 'clearest indication' that Congress intended to enact a constitutionally suspect statute," Union Pac. R.R. v. DHS, 738 F.3d 885, 893 (8th Cir. 2013) (quoting NLRB v. Drivers Local 639, 362 U.S. 274, 284 (1960)), we "construe the statute to avoid [constitutional] problems," De Bartolo, 485 U.S. at 575.

The consumers' jurisdictional theory presents a serious constitutional problem. Article III, to be sure, vests Congress with significant authority over federal jurisdiction. Congress can "elevat[e] to the status of legally cognizable injuries concrete, *de facto*"—i.e., *factual*—"injuries that were previously inadequate in law," Lujan, 504 U.S. at 578, which means "[t]he actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing,'" Warth v. Seldin, 422 U.S. 490, 500 (1975) (quoting Linda

R.S. v. Richard D., 410 U.S. 614, 617 n.3 (1973)). But Congress' ability to do so remains firmly circumscribed by Article III itself. See, e.g., Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 154 (1970). As the Supreme Court said in Lujan, "'[Statutory] broadening [of] the categories of injury that may be alleged in support of standing is a different matter from abandoning the requirement that *the party seeking review* must *himself have suffered an injury*.'" 504 U.S. at 578 (alterations in original) (emphasis added) (quoting Sierra Club v. Morton, 405 U.S. 727, 738 (1972)).

"[T]he requirement of injury in fact is *a hard floor* of Article III jurisdiction that *cannot be removed by statute*." Summers v. Earth Island Inst., 555 U.S. 488, 497 (2009) (emphasis added). Rather than confronting the difficult constitutional question whether Congress can drill through this hard floor of injury *in fact* by creating an injury *in law* (i.e., a statutory cause of action requiring no showing the plaintiff was personally and actually harmed),[3] "we follow 'the traditional rule' and 'independently inquire whether there is another interpretation, not raising . . . serious constitutional concerns, that may fairly be ascribed to [the statute].'" Union Pac., 738 F.3d at 893 (alteration and omission in original) (quoting DeBartolo, 485 U.S. at 577).

Congress clearly incorporated Article III's traditional limits into CAFA. In drafting the Act, Congress was not required to restate existing standing law, nor to specify that Article III limited CAFA's reach, because "Congress legislates against

---

[3]This constitutional question recently reached the Supreme Court without yielding an answer. See First Am. Fin. v. Edwards, 567 U.S. ___, ___, 132 S. Ct. 2536, 2536-37 (2012) (per curiam) (dismissing the writ of certiorari as improvidently granted).

the background of . . . standing." Bennett v. Spear, 520 U.S. 154, 163 (1997).[4] Congress passed CAFA to "restore the intent of the framers of the United States Constitution by providing for Federal court consideration of interstate *cases* of national importance under diversity jurisdiction." CAFA, Pub. L. No. 109–2, § 2(b)(2), 119 Stat. 4, 5 (2005) (emphasis added). This stated purpose is wholly inconsistent with the notion Congress wished to reject Article III's historic injury *in fact* requirement. CAFA's repeated reference to "cases" must be read to incorporate the Supreme Court's well-known explication of that word's constitutional meaning. See, e.g., Lujan, 504 U.S. at 560. We therefore hold CAFA does not purport to extend federal jurisdiction to state claims—if any exist—permitting recovery for bare statutory violations without any evidence the plaintiffs personally suffered a real, non-speculative injury in fact.

Not only have the consumers failed to provide any basis to think the particular packages they purchased were tainted, they affirmatively allege they could not possibly tell if the packages were not kosher. Because the consumers suffered no "particularized[] and actual" injury, Monsanto, 561 U.S. at ___, 130 S. Ct. at 2752, we are bound to conclude the consumers lack traditional Article III standing and CAFA does not extend federal jurisdiction to this case. See Clapper, 568 U.S. at ___, 133 S. Ct. at 1148; Zurn, 644 F.3d at 616.

### B. Remedy

By a different route, we have reached the same conclusion as the district court: the federal courts lack jurisdiction over this case. But this does not mean the district court was correct in dismissing the case with prejudice. When it becomes clear a case originally filed in federal court does not belong there because the plaintiffs lack

---

[4]While Bennett expressly addressed prudential standing, the point is even more applicable here, for unlike prudential standing, Article III standing cannot be "negated" by Congress, "expressly" or otherwise. Bennett, 520 U.S. at 163; see, e.g., Camp, 397 U.S. at 154.

-11-

Article III standing, generally the appropriate remedy is to dismiss *without prejudice*. See, e.g., Constitution Party of S.D. v. Nelson, 639 F.3d 417, 420 (8th Cir. 2011).

If, on the other hand, the case did not originate in federal court but was removed there by the defendants, the federal court *must* remand the case to the state court from whence it came. "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, *the case shall be remanded*." 28 U.S.C. § 1447(c) (emphasis added); see also 28 U.S.C. § 1453(c)(1) (specifying that, with one inapplicable exception, § 1447 "*shall* apply to any removal of a case under this section" (emphasis added)). These words, "on their face, give . . . no discretion to dismiss rather than remand an action." Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund, 500 U.S. 72, 89 (1991) (omission in original) (internal quotation omitted) (reversing and remanding "with instructions that the case be remanded to the [state court]"); see also, e.g., McGee v. Solicitor Gen. of Richmond Cnty., Ga., 727 F.3d 1322, 1326 (11th Cir. 2013). Because this case began in the First Judicial District Court, Dakota County, Minnesota, that is where this case must return.[5]

## III.    CONCLUSION

We vacate the district court's judgment, reverse the district court's dismissal with prejudice, and remand to the district court with instructions to return this case to the Minnesota state court for lack of federal jurisdiction.

_____

---

[5]Even if the district court were right that the First Amendment stripped the federal courts of jurisdiction over this case, remand would still be the correct remedy because § 1447(c) plainly applies to any lack of "subject matter jurisdiction," not merely one predicated on missing Article III standing.

-12-