# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 18-2541

———————————————

Katelyn Webb, as guardian and next friend of K.S. and D.S. and on behalf of
Herself and all Others Similarly Situated; Jerimey Lay, as guardian and next friend
of R.L. and C.L.; Tabitha Lay, as guardian and next friend of R.L. and C.L.

*Plaintiffs - Appellants*

v.

Chelsea Smith, Individually and in her Official Capacity; Stacy Houck,
Individually and in her Official Capacity; Mischa Martin, Individually and in her
Official Capacity; Cindy Gillespie, Individually and in her Official Capacity

*Defendants - Appellees*

——————

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

——————

Submitted: June 11, 2019
Filed: August 28, 2019

——————

Before GRUENDER, ARNOLD, and STRAS, Circuit Judges.

——————

ARNOLD, Circuit Judge.

Few liberty interests are more important than the one parents have in the care, custody, and management of their children, or the one that parents and children have

in the care and companionship of each other. *See Whisman ex. rel. Whisman v. Rinehart*, 119 F.3d 1303, 1309 (8th Cir. 1997). And few governmental interests are more compelling than protecting minor children from abuse or deadly harm. *See id.* Unfortunately these interests sometimes clash, as happened here, when the Arkansas Department of Human Services took two minor children of Katelyn Webb and three minor children of Jerimey and Tabitha Lay into protective custody.

Under Arkansas law, DHS social workers may take a child into emergency protective custody, without a court order, if continued custody of the parent or guardian "presents an immediate danger to the health or physical well-being of the child." Ark. Code Ann. § 12-18-1001(a). That custody may not exceed seventy-two hours, but if the seventy-two hour limit expires on a weekend or holiday, then custody may be extended until the next business day. *Id.* at § 12-18-1001(b). When a social worker takes a child into emergency protective custody, she must notify DHS "and make every effort possible to notify" the parent or guardian of, as relevant, the child's location, the location and phone number of the court, and the procedure for obtaining a hearing. *See id.* § 9-27-313(c)(1). If DHS wishes to extend its custody beyond seventy-two hours, it must demonstrate "probable cause to believe that immediate emergency custody is necessary to protect the health or physical well-being of the juvenile from immediate danger." *See id.* § 9-27-314(a)(1). If DHS does so, "the circuit court shall issue an ex parte order for emergency custody to remove the juvenile from the custody of the parent," *id.*, and that order must include notice to the parents or guardians of their right to a hearing within five business days after the ex parte order is issued. *See id.* § 9-27-314(b)(1). The circuit court must then hold a probable-cause hearing within five business days after issuing the ex parte order. *See id.* § 9-27-315(a)(1)(A). The hearing is limited to "determining whether probable cause existed to protect the juvenile" and whether it still exists. *See id.* § 9-27-315(a)(1)(B)(i). So it can take ten to fourteen days (depending on when weekends and holidays fall) after a child has been removed before state law gives a parent the right to be heard at a hearing.

In Webb's case, a state juvenile court jailed her for five days for contempt of court in a matter not relevant here and ordered Chelsea Smith, a DHS social worker, to take Webb's minor children into custody. Webb alleges that, two days after completing her five days in jail (and thus contrary to the seventy-two hour rule in § 12-18-1001(b)), DHS petitioned the juvenile court for an ex parte order allowing it to maintain temporary protective custody over Webb's children. The juvenile court granted the petition and set a probable-cause hearing for seven days (five business days) later. The day before the scheduled hearing, the juvenile court postponed the hearing for an unknown reason. Because the juvenile court did not hold the hearing within five business days of issuing the ex parte order, it appears state law was again violated. *See id.* at § 9-27-315(a)(1)(A). The juvenile court rescheduled the hearing for eight days after the initial probable-cause hearing was scheduled. That hearing occurred as scheduled, but when the juvenile court was about to appoint counsel for Webb, she informed the court she preferred different counsel. The juvenile court continued the hearing and reset it for six days later so Webb could secure counsel. At that hearing, the juvenile court held that probable cause had existed at the time the children were removed but that there was no need for DHS to continue its custody. The juvenile court restored custody of the children to Webb, but it also ordered that a protective-services case be opened. In total, DHS had protective custody of the Webb children for about twenty-eight days.

As for the Lays, DHS social worker Stacy Houck took the Lay children into emergency protective custody after, as the district court said, "a serious charge of abuse was asserted against Jerimey." Two days later DHS petitioned for an ex parte order extending its custody, and two days after that a juvenile court entered an ex parte order doing so. The court held a probable-cause hearing three days later, but the hearing did not conclude that day. The juvenile court therefore ordered that the children be returned to the Lays unless the attorney ad litem objected within two days. The attorney ad litem objected, so the hearing resumed four days after it had originally begun. At the resumption of the hearing, the juvenile court ordered that the

-3-

children be returned to Tabitha Lay under certain conditions, including that Jerimey Lay could not contact the children or live in the family home. In all, the Lay children spent about eleven days in emergency protective custody.

Webb and the Lays filed this lawsuit on behalf of themselves and their children against the social workers involved in their cases and two of their DHS supervisors, all in their individual and official capacities. Asserting violations of the First, Fourth, and Fourteenth Amendments to the U.S. Constitution, the plaintiffs raised, as the district court interpreted their complaint, "four categories of federal claims." They complained, first, that the social workers unconstitutionally seized their children because they lacked a reasonable suspicion of child abuse or neglect and filed petitions to remove the children that contained knowingly false allegations; second, that the social workers deprived them of an opportunity to be heard in a timely manner after the seizures; third, that the DHS supervisors failed to train and supervise the social workers and established policies that led to the constitutional violations; and fourth, on behalf of themselves and a proposed class of similarly situated people, that the Arkansas statutes governing post-deprivation proceedings for the parents of children taken into emergency protective custody are facially unconstitutional.

The defendants moved to dismiss the complaint on the grounds that, as relevant here, the plaintiffs lacked standing and failed to state a claim. The district court rejected the defendants' argument that, since the alleged injuries were not fairly traceable to the defendants, the plaintiffs lacked standing. The court pointed out, however, that a decision striking down the statutes governing post-deprivation proceedings might not redress the harms the plaintiffs sustained because those harms had already occurred and would not necessarily occur again. In other words, according to the district court, that claim was moot because the plaintiffs had not demonstrated any continuing, present adverse effects entitling them to declaratory or injunctive relief. The district court also held that the *Rooker-Feldman* doctrine barred the plaintiffs' claims against the individual social workers for unconstitutionally

seizing their children by filing petitions containing false allegations. Finally, the district court dismissed the due-process claim against Houck because she had promptly initiated judicial proceedings after seizing the Lay children; the court declined to dismiss the related claim against Smith and her DHS supervisors because Smith did not promptly initiate proceedings to remove the Webb children.

Both parties asked the court to reconsider its decision, and the plaintiffs moved for leave to file an amended complaint to cure some of the deficiencies the court had identified relating to mootness. After considering some of the transcripts of the state court proceedings, the district court dismissed the action in full. (The plaintiffs do not take issue with the court's decision to consider those transcripts.) The district court also denied plaintiffs leave to amend their complaint, on the ground that amendment would be futile; but it nonetheless considered the new information alleged in the proposed amended complaint to hold that the plaintiffs indeed had standing and that their claims were not moot. The court considered new allegations that the adult plaintiffs were Arkansas residents of childbearing age, that many of the child plaintiffs were still minors, and that the families' prior dealings with DHS increased the odds "that another situation with DHS will occur." The district court reasoned that these new facts had "established a reasonable likelihood that they may be subject to having their children taken into protective custody by DHS in the future," so their claims were not moot.

Despite that finding, the district court declined to rule whether the Arkansas statutes at issue are facially unconstitutional, explaining that "[t]here is no binding authority on point and this Court will not, under the guise of interpreting the constitution, create a rule that would render the Arkansas statutes facially invalid" given the difficulty of raising a successful facial challenge. The court stood by its other rulings, except that the transcripts and other record materials from the state court proceedings showed that Smith had initiated judicial proceedings promptly, so

the claims against her and her DHS supervisors were dismissed. The plaintiffs appealed, arguing that the district court erred in dismissing their claims.

The defendants noted in their brief on appeal that, though they "do not concede that [the plaintiffs] have standing, they do not address this issue in this appeal." We nonetheless begin with a consideration of whether the plaintiffs have presented an Article III case or controversy because we have an independent obligation to assure ourselves of subject-matter jurisdiction, even when no party raises the issue. *See Oglala Sioux Tribe v. Fleming*, 904 F.3d 603, 609 (8th Cir. 2018). Plaintiffs must demonstrate they have standing for each claim they bring and for each form of relief they seek. *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).

We have no difficulty concluding that the plaintiffs have standing to seek damages, to the extent they do so, against the individual defendants. Though the defendants below challenged whether the plaintiffs' injuries were "fairly traceable" to the defendants' conduct, a requirement for standing, *see id.*, we agree with the district court that, since "the seizure of the children did lead to the court proceedings," and the complaint alleges those seizures were unlawful, the plaintiffs have done enough at this stage to demonstrate standing. As explained later in this opinion, we do not think ultimate responsibility for the plaintiffs' alleged due-process injuries rests with the defendants. But the fairly-traceable inquiry is much more forgiving than the merits-based, tort-causation inquiry. If the two inquiries were coterminous, they would collapse into one another, and a court could never reject a plaintiff's claim on the merits for lack of causation, which is traditionally a merits-based inquiry. We think this is one of the numerous cases where claims satisfy Article III's fairly-traceable requirement but nonetheless fail on the merits because of a lack of causation.

The plaintiffs' standing to obtain declaratory and injunctive relief, which they seek as remedies for their facial attack on the constitutionality of the relevant statutes,

-6-

is a more difficult matter. They ask for a declaratory judgment "that any statute that allows more than three days for a post-seizure hearing . . . is unconstitutional," and an injunction "requiring the Defendants to provide Plaintiff[s] and the class with a prompt, proper, and post deprivation hearing within 72 hours of seizure or other appropriate time to be set by the Court." The plaintiffs argue here, and the district court held, that the new allegations in their proposed amended complaint, already noted, prevented their claims from becoming moot because the harm they suffered is capable of repetition yet evading review. *See Abdurrahman v. Dayton*, 903 F.3d 813, 817 (8th Cir. 2018). The plaintiffs may indeed be correct that the cloud of DHS emergency intervention prevents their claims from becoming moot. But "if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum" because some harms "may be too speculative to support standing[] but not too speculative to overcome mootness."*See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190–91 (2000).

To demonstrate standing for prospective relief, the plaintiffs must show that they face "a real and immediate threat that [they] would again suffer similar injury in the future," not a conjectural or hypothetical one. *See Frost v. Sioux City*, 920 F.3d 1158, 1161 (8th Cir. 2019). Their previous injuries do not give them standing to pursue injunctive or declaratory relief; they must show they are experiencing an ongoing injury or an immediate threat of injury. *See id.* at 1161–62. We do not think the plaintiffs have done so. All they propose to allege is that they have an increased chance of having "another situation" with DHS. They do not show, or even allege, that a subsequent "situation" with DHS will involve DHS taking their minor children into emergency custody for more than seventy-two hours or that they will be subject to untimely hearings in violation of their constitutional rights. To conclude that these events are likely or immediate would "take us into the area of speculation and conjecture." *See Smook v. Minnehaha Cty.*, 457 F.3d 806, 816 (8th Cir. 2006). We therefore uphold the district court's dismissal of the plaintiffs' facial challenge to the

relevant statutes, but instruct the court on remand to dismiss this claim without prejudice. *See Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1033 (8th Cir. 2014).

Turning to the merits of the claims for damages, we first consider whether the district court erred in dismissing the plaintiffs' claims against the individual social workers for failing to provide a timely post-deprivation hearing. Since parents have a liberty interest in the care, custody, and management of their children, and parents and children have a liberty interest in each other's companionship, *see Whisman*, 119 F.3d at 1309, due process requires that a state provide a prompt post-deprivation hearing after taking a child into emergency custody. *Swipies v. Kofka*, 419 F.3d 709, 715 (8th Cir. 2005). As the district court noted, neither we nor other circuit courts have drawn a bright line applicable in all cases that establishes a moment when a hearing is no longer considered prompt; instead, courts consider the facts of each particular case. So, for example, we explained in *Whisman* that, "[u]nder the facts of this case," a hearing that occurred seventeen days after removal of the children was not prompt. 119 F.3d at 1310. We reached the same conclusion in *Swipies*. 419 F.3d at 715.

At first glance, it might appear that the plaintiffs here did not receive prompt post-deprivation hearings: Webb did not receive a hearing for twenty-eight days, and the Lays, in a closer case, did not receive a (completed) hearing for eleven days. But even assuming their due process rights were violated, a matter we need not decide, we agree with the district court that the violation cannot be attributed to Smith or Houck. Both social workers timely engaged the cogs of the judicial machinery by swearing out affidavits within two days of the children being removed. We do not understand how they contributed to any subsequent delays, considering they lack the authority to file ex parte petitions or to schedule hearings on state-court dockets.

The plaintiffs respond by pointing out that we have held other people, like social workers, legally responsible when they took children into emergency protective

custody without ensuring that their parents received a prompt post-seizure hearing. But in those cases, the people who removed the children contributed to the delay in proceedings. In *Whisman*, a social worker helped delay a hearing and the return of the child to the parent or a suitable family member, resulting in a hearing being held seventeen days after seizure. 119 F.3d at 1310. In *Swipies*, a police officer removed a child from his father's custody but did not inform the juvenile court or the parent that he had taken the child to the child's other custodial parent. 419 F.3d at 713. The social workers here did nothing of the sort.

The plaintiffs also point to *Hayes v. Faulkner County*, a case that involved an arrestee who spent thirty-eight days in jail before appearing in front of a judge. 388 F.3d 669 (8th Cir. 2004). The arrestee sued the sheriff and county where he was detained, but they maintained, as do the social workers here, that it was the court's responsibility to schedule a hearing. We rejected the argument, noting that the law placed the onus on the defendants to bring a detainee to the court for a first appearance. *Id.* at 674. Further, we mentioned that the only thing the defendants did to initiate judicial proceedings was send a jail roster to the courts in the county and then wait for the court to identify whom it would pick up for hearings. *Id.* Here, by contrast, the social workers took a much more active role in initiating court proceedings by swearing out lengthy affidavits, to be included in ex parte petitions, discussing the specific circumstances of each removal. That's fundamentally different from merely passing along a jail roster and leaving it to the court to identify new arrestees who had not yet received a hearing. Further, in the emergency-custody context, state law places the onus on state courts to provide a hearing, not social workers. *See* Ark. Code Ann. § 9-27-315(a)(1)(A). We therefore do not think *Hayes* applicable.

Because we agree with the district court that the plaintiffs have failed to state a claim against Smith and Houck based on the untimeliness of post-deprivation hearings, we affirm the district court's dismissal of those claims. We also affirm the

court's dismissal of the claims against their DHS supervisors. Since Smith and Houck did not cause any of the plaintiffs' harm, we cannot say that a policy or custom their supervisors created or applied, or their alleged failure to train or supervise them, did either. *Cf. Brockinton v. City of Sherwood*, 503 F.3d 667, 673 (8th Cir. 2007).

We next turn to the plaintiffs' claim that Smith and Houck violated their constitutional rights by seizing their children using ex parte petitions containing knowingly false allegations. We do not read the plaintiffs' complaint as requesting prospective relief on these claims, and, if they did, they would lack standing to do so for reasons we have already discussed. We also read the complaint as alleging these claims against only Smith and Houck, not their DHS supervisors in their supervisory roles.

The district court held that the *Rooker-Feldman* doctrine barred these claims, a decision we review de novo. *See Edwards v. City of Jonesboro*, 645 F.3d 1014, 1017 (8th Cir. 2011). That doctrine "precludes lower federal courts from exercising jurisdiction over actions seeking review of, or relief from, state court judgments." *Hageman v. Barton*, 817 F.3d 611, 614 (8th Cir. 2016). Only the Supreme Court has jurisdiction over such actions. *Edwards*, 645 F.3d at 1017. The Supreme Court has cautioned lower courts not to take a broad view of *Rooker-Feldman*, expressly limiting its application to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). An important consideration for a court confronted with the issue of whether *Rooker-Feldman* applies is to analyze "the effect the requested federal relief would have on the state court judgment." *See Simes v. Huckabee*, 354 F.3d 823, 827 (8th Cir. 2004).

We hold that the district court erred in applying *Rooker-Feldman*. The state courts here never issued any judgments; they entered orders in cases that were later

voluntarily dismissed, which under Arkansas law is a decision "without prejudice and is not an adjudication on the merits." *Beverly Enters.-Ark., Inc. v. Hillier*, 14 S.W.3d 487, 488 (Ark. 2000). So the requested federal relief cannot affect any state-court judgments because there aren't any. *See Simes*, 354 F.3d at 827. As one commentator explains, "[i]f there is no state-court judgment, the complaint cannot address injury caused by a judgment; whatever other questions may arise, Rooker-Feldman does not apply." 18B Charles Alan Wright et al., Federal Practice & Procedure § 4469.1 (2d ed. April 2019 Update). At least one other circuit has rejected application of *Rooker-Feldman* when the underlying state suit was voluntarily dismissed and thus did not proceed to a final judgment. *See Del-Ray Battery Co. v. Douglas Battery Co.*, 635 F.3d 725, 730 (5th Cir. 2011).

Relatedly, there is in the *Rooker-Feldman* context a distinction between "a federal claim alleging injury caused by a state court judgment and a federal claim alleging a prior injury that a state court failed to remedy." *See Skit Int'l, Ltd. v. DAC Techs. of Ark., Inc.*, 487 F.3d 1154, 1157 (8th Cir. 2007). The plaintiffs here do not appear to be seeking to get out from under a state-court judgment; they are trying to obtain damages from state actors who allegedly violated their rights. In a similar case involving the application of *Rooker-Feldman* to a state court's ex parte order regarding emergency protective care of a minor, we noted that *Rooker-Feldman* did not apply because the plaintiffs "do not seek to overturn the ex parte order by this action. Rather, they seek redress under 42 U.S.C. § 1983 for an alleged unconstitutional seizure of" their child. *See Riehm v. Engelking*, 538 F.3d 952, 965 (8th Cir. 2008). In other words, the plaintiffs do not allege injury from the state-court orders; they allege injury from the actions of the social workers. *Rooker-Feldman* therefore doesn't apply.

That is not to say that the plaintiffs' claims against the social workers are meritorious. All we are saying is that *Rooker-Feldman* does not bar these claims, and

-11-

we leave it to the district court on remand to determine whether those claims have merit going forward.

We therefore affirm in part, reverse in part, and remand this case for further proceedings.

_____