# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-3138
_____

Amy McNaught

*Petitioner*

v.

Billy Nolen, Acting Administrator, Federal Aviation Administration

*Respondent*

_____

Petition for Review of an Order of the
Federal Aviation Administration

_____

Submitted: May 10, 2023
Filed: August 4, 2023

_____

Before SHEPHERD, STRAS, and KOBES, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Amy McNaught is a pilot and flight instructor. After she failed to produce her pilot logbooks and training records upon request by the Federal Aviation Administration (FAA), the FAA suspended McNaught's pilot certificate. McNaught appealed the suspension to the National Transportation Safety Board (NTSB) but, days later, complied with the records request. The FAA then terminated her suspension, which lasted 14 days in total, and reinstated her certificate. Nonetheless,

an NTSB administrative law judge held a hearing on McNaught's appeal and concluded that the suspension was reasonable. McNaught appealed the decision to the full NTSB, but it dismissed the matter as moot. McNaught now petitions this Court for review of the NTSB's final order under 49 U.S.C. §§ 44709(f) and 46110. Because we conclude that McNaught lacks Article III standing, we dismiss the petition for lack of jurisdiction.

I.

On April 21, 2022, the FAA sent a letter to McNaught at her address of record in Fairbanks, Alaska, asking her to produce her pilot logbooks and training records pursuant to an ongoing investigation of allegedly irregular flight operations. Federal regulations require pilots to "present their pilot certificate, medical certificate, logbook, or any other record required . . . for inspection upon a reasonable request" by the FAA. 14 C.F.R. § 61.51(i)(1). The letter stated that McNaught had 10 days from receipt to arrange for the inspection, otherwise action would be taken to suspend her pilot certificate. The FAA received no response.

An FAA inspector, Robert Markise, then called McNaught at a telephone number obtained from her FAA records. At the time, McNaught was in Dubai receiving training for her job as a flight instructor. She anticipated being there for a few months before returning to the United States. Inspector Markise reached McNaught in Dubai. In their brief telephone conversation, McNaught stated that she never received the April 21 letter, confirmed the Alaska address as her address of record, and provided an email address. Inspector Markise then emailed McNaught a copy of the initial request letter. Again, the FAA received no response.

Accordingly, on May 20, Inspector Markise sent a letter to McNaught's Alaska address notifying her that she was under investigation for failing to produce her logbooks and training records. He also emailed McNaught a copy of the letter. Inspector Markise again received no response. Thus, on July 14, the FAA issued an emergency order suspending McNaught's pilot certificate pending her compliance

-2-

with the records request, pursuant to 49 U.S.C. § 44709(b) (providing that the FAA "may issue an order amending, modifying, suspending, or revoking" a pilot certificate if it "decides after conducting a reinspection, reexamination, or other investigation that safety in air commerce or air transportation and the public interest require that action").

Days later, McNaught returned to the United States and sought review of the FAA's suspension order by the NTSB. See id. § 44709(d). McNaught then complied with the records request by meeting with Inspector Markise and providing her logbooks and training documentation, pursuant to 14 C.F.R. § 61.51(i)(1). She also changed her address of record from the Fairbanks, Alaska address to an address in Lincoln, Nebraska. On July 28, the FAA terminated McNaught's suspension and closed all legal enforcement of the matter.

McNaught's still-pending appeal was referred to an NTSB administrative law judge (ALJ). Having terminated the suspension order, the FAA asked the ALJ to dismiss the appeal as moot. McNaught opposed the motion to dismiss, arguing that there was still "a dispute as to whether the [records] request was made and, if so, [whether it was] reasonably communicated to [McNaught] under the circumstances" and, further, that the suspension was "potentially a permanent reporting event" in the Pilot Records Database (PRD).[1] The ALJ denied the FAA's motion to dismiss,

---

[1]The PRD is an electronic database maintained by the FAA pursuant to statute. See generally 49 U.S.C. § 44703(i); 14 C.F.R. § 111.1. The PRD includes various records on individual pilots, including pilot certificates, ratings, tests, and "summaries of legal enforcement actions resulting in a finding by the Administrator of a violation of this title or a regulation prescribed or order issued under this title that was not subsequently overturned." 49 U.S.C. § 44703(i)(2)(A)(iii). Covered "air carrier[s]"—a subset of FAA-certified entities that generally provide air transportation for passengers or property as common carriers—must review a new hire's PRD file before allowing the pilot to begin service. Id. § 44703(i)(1). Air carriers and other entities who want to access the PRD must apply for access with the FAA. 14 C.F.R. § 111.15. Further, a reviewing entity may not access an individual pilot's PRD file without receiving that pilot's written consent. Id. § 111.120(a).

so as to afford McNaught "every benefit of the doubt," and held a hearing on the matter. The ALJ allowed the parties to call witnesses and present evidence on whether notice of the records request was reasonably communicated to McNaught and whether the suspension was reasonable. Ultimately, the ALJ found that the records request and the suspension were both reasonable.

McNaught appealed the ALJ's decision to the full NTSB. McNaught alleged a bevy of procedural errors by the ALJ, including that the ALJ erred in denying a pretrial motion to compel evidence and in overruling various objections made during the hearing. The FAA disputed those errors and asked the NTSB to affirm on the merits. In its order, the NTSB held that the matter should have been dismissed as moot "[b]ecause there was no existing order before the [ALJ]" and, thus, "no action for the [ALJ] to take." Citing agency case law, the NTSB concluded that the ALJ "no longer had jurisdiction over the matter once the order and complaint bringing the action against [McNaught] were withdrawn." Accordingly, the NTSB found that it lacked jurisdiction over the appeal, granted the FAA's motion to dismiss, and vacated the ALJ's decision.

McNaught timely filed this petition for review of the NTSB's final order pursuant to 49 U.S.C. §§ 44709(f) and 46110(a), which allow any "person substantially affected by an order of the [NTSB]" to "obtain judicial review" thereof. Id. § 44709(f). In her petition, McNaught argues that the NTSB erred in two respects: (1) by ruling that her appeal of the FAA's order of suspension was moot; and (2) by failing to address clear errors committed by the ALJ.

II.

We first must decide whether McNaught's petition presents a justiciable case or controversy. Before us, the parties debate related issues of standing and mootness. McNaught focuses her briefing on refuting the NTSB's conclusion that her case was moot before the ALJ. But the FAA argues that the case now presents a question of standing, not mootness. It contends that McNaught lacks standing to petition this

-4-

Court for review because she has not suffered a concrete injury in fact from the now-terminated 14-day suspension. McNaught responds by arguing that she has standing because she has a personal stake in removing the suspension from her record, which constitutes an injury in fact.

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." Sch. of the Ozarks, Inc. v. Biden, 41 F.4th 992, 997 (8th Cir. 2022) (quoting DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006)). As the Supreme Court has recognized, standing doctrine is "rooted in the traditional understanding of a case or controversy." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). To establish standing to sue in federal court, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Id. The related mootness doctrine asks whether "during the course of litigation, the issues presented in a case 'lose their life because of the passage of time or a change in circumstances . . . and a federal court can no longer grant effective relief.'" Young Am.'s Found. v. Kaler, 14 F.4th 879, 886 (8th Cir. 2021) (alteration in original) (citation omitted). "The difference between standing and mootness . . . is merely one of 'time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" Sisney v. Kaemingk, 15 F.4th 1181, 1194 (8th Cir. 2021) (quoting Arizonans for Off. Eng. v. Arizona, 520 U.S. 43, 68 n.2 (1997)).

We agree with the FAA that this case first presents a question of standing, not mootness. Cf. Narragansett Indian Tribal Historic Pres. Off. v. FERC, 949 F.3d 8, 12 (D.C. Cir. 2020) ("Th[e] problem 'may sound like one of mootness—a justiciable controversy existed but no longer remains—but the timing makes [it] one of standing.'" (second alteration in original) (citation omitted)). After all, standing is assessed "at the time the action commences." Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 169 (2000); see also Davis v. FEC, 554 U.S. 724, 734 (2008) ("[T]he standing inquiry remains focused on whether the party

invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*." (emphasis added)). And because McNaught's petition for review marks the "commencement of the litigation" in federal court, Sisney, 15 F.4th at 1194 (citation omitted), we must ask whether she has standing to seek Article III review in the first place. See Narragansett Indian Tribal Historic Pres. Off., 949 F.3d at 12 ("'Standing is assessed "at the time the action commences,"' which in the case of a petition for review is 'the time [the petitioner] sought relief from an Article III court[.]'" (alterations in original) (citation omitted)). Further, the "mere fact" that McNaught was a party to NTSB proceedings "is not dispositive of the issue of standing for purposes of invoking the jurisdiction of a federal court." City of St. Louis v. Dep't of Transp., 936 F.2d 1528, 1532 (8th Cir. 1991). As we have explained, "[a]gencies are not Article III creatures, and Congress may allow anyone it wishes . . . to become parties in agency proceedings. When the case gets to court, though, the courts must independently satisfy themselves that the Article III requirement that a case or controversy be presented is satisfied." Id.

The standing inquiry in this case comes down to whether McNaught has plausibly alleged an injury in fact. An injury in fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, 578 U.S. at 339 (citation omitted). As to the concrete-harm requirement, we "assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2204 (2021) (citation omitted).[2] As the party invoking federal jurisdiction, McNaught

---

[2]Beyond the Article III standing requirements, petitions for judicial review of NTSB orders also must satisfy a statutory requirement that the petitioner be "substantially affected by an order of the [NTSB]." 49 U.S.C. § 44709(f). However, we need not decide whether McNaught has a statutory cause of action to seek relief from this Court because we can resolve this case on Article III standing grounds— and, therefore, *must* do so. See Miller v. Redwood Toxicology Lab'y, Inc., 688 F.3d 928, 934 (8th Cir. 2012) ("Article III standing must be decided first by the court and presents a question of justiciability; if it is lacking, a federal court has no subject-

bears the burden of establishing standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation." Young Am.'s Found., 14 F.4th at 887 (citation omitted). "At the pleading stage, therefore, [McNaught] must 'allege sufficient facts to support a reasonable inference that [she] can satisfy the elements of standing.'" Sch. of the Ozarks, 41 F.4th at 997 (citation omitted). On this basis, we address McNaught's claims of injury and conclude that she lacks standing to sue in federal court.

## A.

McNaught first makes a claim of future injury: the suspension will harm her prospects of future employment. McNaught says that she wants to apply for certain pilot jobs, but her 14-day suspension in the PRD will be an "automatic disqualification." Claims of future harm may be sufficient to establish Article III standing "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." Dep't of Com. v. New York, 139 S. Ct. 2551, 2565 (2019) (citation omitted). Put differently, "[a] plaintiff must show that he 'sustained or is immediately in danger of sustaining some direct injury as the result of the challenged . . . conduct and that the injury or threat of injury must be both real and immediate.'" Smith v. Golden China of Red Wing, Inc., 987 F.3d 1205, 1209 (8th Cir. 2021) (alteration in original) (citation omitted). "'[A]llegations of *possible* future injury' are not sufficient." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (citations omitted).

The first problem with McNaught's theory of future injury is that she has not shown with particularity how her brief suspension for noncompliance with a records request would harm her job prospects. See Spokeo, 578 U.S. at 339 (requiring a "concrete and particularized" injury for standing). Instead, McNaught opts for broad

matter jurisdiction over the claim." (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 92-94 (1998)).

-7-

generalities.  At the hearing before the ALJ, McNaught asserted that the suspension is "devastating" and an "automatic disqualification" for certain jobs.  J.A. 0368. And in her briefs, McNaught characterizes the suspension as a "permanent stain on her record," Pet'r's Br. 21, citing a line of out-of-circuit cases holding that terminated professional discipline confers a "continuing stigma" sufficient to defeat claims of mootness.  See In re Surrick, 338 F.3d 224, 229-30 (3d Cir. 2003) (holding that attorney's challenge to 30-month suspension from law practice was not moot, even though suspension had expired); Furline v. Blakey, 246 F. App'x 813, 815 (3d Cir. 2007) (per curiam) (holding that pilot's challenge to 180-day suspension was not moot, even though suspension had expired).  However, other cases have come out differently on similar facts.  See Westmoreland v. NTSB, 833 F.2d 1461, 1463 (11th Cir. 1987) (per curiam) (holding that "possibility of . . . harm" from pilot's temporary suspension "is too speculative to create a cognizable interest in the outcome of this litigation").  Moreover, the record before us is devoid of any facts demonstrating *how* or *why* that is the case here.  Without more, McNaught's alleged harms based on how unspecified employers might interpret a brief suspension is "too speculative for Article III purposes."  Wallace v. ConAgra Foods, Inc., 747 F.3d 1025, 1030 (8th Cir. 2014) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 564 n.2 (1992)); cf. Clapper, 568 U.S. at 413 ("[W]e have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment.").

Even assuming the 14-day suspension would be damaging to her job prospects, McNaught's claims of future harm are hardly "real and immediate." Golden China of Red Wing, 987 F.3d at 1209 (citation omitted).  Instead, they rest entirely on a "desire to engage in future conduct at an unspecified and indefinite time."  Bernbeck v. Gale, 829 F.3d 643, 648 (8th Cir. 2016).  The most concrete statement of her intention to apply for future employment came at the ALJ hearing, where McNaught stated she wanted "a pilot position . . . to support our military, to support humanitarian efforts."  She reiterated that these are "job[s] that [she] really want[s]."  J.A. 0368-69.  But nowhere in the record does McNaught identify the specific jobs she wants to apply for or—just as essential to our analysis—*when* she

intends to apply for those jobs. Instead, the record reflects little more than an "amorphous level of intention" to apply for some vaguely defined positions at some indeterminate point in the future. Golden China of Red Wing, 987 F.3d at 1209. "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of . . . 'actual or imminent' injury." Lujan, 504 U.S. at 564. This is especially so since "the acts necessary to make [McNaught's] injury happen are at least partly *within* [*her*] *own control*." Bernbeck, 829 F.3d at 648 (quoting Lujan, 504 U.S. at 564 n.2). Under such circumstances, the plaintiff must allege future injury with a "high degree of immediacy" and cannot rest on "a mere statement of intent." Id. McNaught has not met that standard here.

B.

McNaught also argues that, apart from any injury based on "future employment," she is injured by the simple fact of the "reporting of her indefinite suspension on the PRD." Pet'r's Reply 4; Pet'r's Br. 19. We interpret this as a claim of reputational harm, which, as the Supreme Court has recognized, can be a basis for an injury in fact under Article III. See TransUnion, 141 S. Ct. at 2204 ("Various intangible harms can also be concrete. Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts. Those include, for example, reputational harms . . . ." (citation omitted)); see also Meese v. Keene, 481 U.S. 465, 475 (1987) ("[T]he need to take such affirmative steps to avoid the risk of harm to [plaintiff's] reputation constitutes a cognizable injury . . . .").

Nonetheless, "naked assertion[s]" of reputational harm "fall[] short of plausibly establishing injury." Auer v. Trans Union, LLC, 902 F.3d 873, 878 (8th Cir. 2018) (citation omitted). Rather, like any claim of injury in fact, reputational harm must be "concrete and particularized" to support standing. Spokeo, 578 U.S. at 339 (citation omitted). Consistent with the plaintiff's burden to "allege sufficient facts to support a reasonable inference" of injury at the pleading stage, Sch. of the

Ozarks, 41 F.4th at 997 (citation omitted), a plaintiff alleging reputational harm must show *how* the defendant's actions harm her reputation. See Auer, 902 F.3d at 878 (rejecting claim of reputational harm when plaintiff "did not plead any facts establishing that the [defendant]'s actions damaged her reputation"). Further, concrete reputational harm typically requires disclosure of harmful information to third parties. See Braitberg v. Charter Commc'ns, Inc., 836 F.3d 925, 930 (8th Cir. 2016) ("[T]he retention of information lawfully obtained, without further disclosure, traditionally has not provided the basis for a lawsuit in American courts."); cf. TransUnion, 141 S. Ct. at 2209 ("[T]here is 'no historical or common-law analog where the mere existence of inaccurate information, absent dissemination, amounts to concrete injury.'" (citation omitted)).

McNaught's claim of reputational harm based on the mere inclusion of her temporary suspension in the PRD fails on both fronts. First, as described in our future-injury analysis, McNaught has not shown how the 14-day suspension harms her reputation as a pilot. Reputational harms are generally actionable if the challenged action would "lower [the plaintiff] in the estimation of the community or . . . deter third persons from associating or dealing with him." Restatement (First) of Torts § 559 (defining defamatory communication). But the record here lacks any facts showing that McNaught's suspension would harm her reputation in the estimation of the pilot community. Instead, McNaught relies on vague, blanket statements of reputational harm, i.e., that the suspension is an "automatic disqualification" for future employment and a "permanent stain on her record." Breezy declarations such as these fall well short of establishing the "concrete and particularized" injury required for standing. Spokeo, 578 U.S. at 339 (citation omitted); accord Crabtree v. Experian Info. Sols., Inc., 948 F.3d 872, 880 (7th Cir. 2020) ("It is not enough to say that your reputation was harmed without explaining how.").

McNaught also has not shown that her 14-day suspension has been or will likely be disseminated by the FAA to third parties, which is typically required for claims of reputational harm. See Braitberg, 836 F.3d at 930; Restatement (First) of

-10-

Torts § 577 ("[U]nless the defamatory matter is communicated to a third person there has been no loss of reputation, since reputation is the estimation in which one's character is held by his neighbors or associates."). McNaught is correct—and the FAA does not dispute—that her suspension qualifies for inclusion in the PRD as a "summar[y] of [a] legal enforcement action[]". See 49 U.S.C. § 44703(i)(2)(A)(iii). However, the PRD is not a publicly accessible database. It is created as a resource for covered "air carrier[s]," who must "access and evaluate" a pilot's records before hiring that pilot. 49 U.S.C. § 44703(i)(1). But access is not freely granted; rather, entities must apply for access. See 14 C.F.R. § 111.15. And once granted access, entities may not "share, distribute, publish, or otherwise release any record accessed in the database to any person or individual not directly involved in the hiring decision." Id. § 111.30(b). Further, each entity "must protect the confidentiality of [a pilot's] records." Id. § 111.30(c). Finally, and perhaps most critically, reviewing entities may not retrieve a pilot's records "prior to receiving that pilot's written consent." 14 C.F.R. § 111.120(a). In sum, the PRD is a private, internal database maintained by the FAA that certain employers access for limited purposes. Further, individual pilots ultimately control who sees their records. By merely including the fact of McNaught's suspension in the PRD, the FAA is not disseminating that information to third parties. And without disclosure, there can be no reputational harm. Braitbert, 836 F.3d at 930; accord Barker v. TSA, 353 F. App'x 450, 453 (1st Cir. 2009) ("Barker also alleges that reputational harm may result from the TSA's decision to place the warning notice in Barker's TSA file. He has not, however, alleged that this confidential record has or ever will be accessed by the public.").

### III.

In sum, McNaught has not demonstrated that she has suffered an injury in fact necessary for standing to sue in federal court. Therefore, we lack jurisdiction. The petition is dismissed.

-11-

STRAS, Circuit Judge, concurring.

Putting this case in the right jurisdictional box is more difficult than the court makes it out to be. One possibility is a lack of standing, the path the court chose, because "[t]he requisite personal interest" was gone by the time McNaught filed an appeal with us. *Nat'l Right to Life Pol. Action Comm. v. Connor*, 323 F.3d 684, 691 (8th Cir. 2003) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).

Another way to view it is mootness. *See Westmoreland v. NTSB*, 833 F.2d 1461, 1462–63 (11th Cir. 1987) (per curiam) (relying on mootness under near-identical circumstances). When the administrative review process began, McNaught was still seeking the reinstatement of her pilot's license. But then the case became moot once she received it back, even though there was no Article III court involved yet. *See id.*

On these facts, the right answer appears to be a matter of semantics. It depends on whether the "[c]ase[]" or "[c]ontrovers[y]" began when the dispute was before the administrative agency or first reached us. U.S. Const. art. III, § 2, cl. 1. Under the latter scenario, McNaught lacked standing because the case was over before it began. If the controversy began earlier, it is now moot because there is no further relief we can give. *See Sandidge v. Washington*, 813 F.2d 1025, 1026 (9th Cir. 1987) (explaining that any injury was too "speculative" because the plaintiff could not connect a negative entry on his record to the potential loss of any *specific* job). Either way, there is no "[c]ase[]" or "[c]ontrovers[y]" for us to decide. U.S. Const. art. III, § 2, cl. 1.

———————————————————

-12-