**NORTHWEST NATIONAL BANK, FAYETTEVILLE, ARKANSAS, Petitioner,**

v.

**UNITED STATES of America DEPARTMENT OF THE TREASURY OFFICE OF THE COMPTROLLER OF THE CURRENCY, Respondent.**

No. 89–1248.

United States Court of Appeals, Eighth Circuit.

Submitted March 12, 1990.

Decided Oct. 29, 1990.

James V. Elliott, San Francisco, Cal., for petitioner.

Yvonne D. McIntire, Washington, D.C., for respondent.

Before JOHN R. GIBSON and MAGILL, Circuit Judges, and FLOYD R. GIBSON, Senior Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

Northwest National Bank appeals from a cease and desist order issued by the Office

of the Comptroller of the Currency. Northwest argues that the order should be rescinded because: (1) the record before the Comptroller did not support his conclusions regarding the amount of abnormally risky loans in the bank's portfolio and the sufficiency of the bank's capital accounts; (2) the fact that the bank's financial condition may be unsafe and unsound does not establish that bank management engaged in unsafe and unsound conduct; (3) the Comptroller erred in finding Northwest in violation of various provisions of the banking laws; and (4) the Comptroller violated Northwest's due process rights by his handling of its case. We affirm the issuance of the cease and desist order.

Northwest is a national banking association and is both chartered and examined by the Comptroller, *see* 12 U.S.C. § 27 (1988); 12 U.S.C.A. § 481 (West 1989 & Supp. 1990), and is insured within the meaning of 12 U.S.C.A. § 1818(b)(1) (West 1989).

Northwest was examined during April and May of 1987 by a National Bank Examiner, Stephen C. Toler, who recommended to the Comptroller that Northwest be placed under a cease and desist order. Toler concluded that Northwest was following a number of unsound banking practices, including: (1) failing to properly manage its loan portfolio; (2) operating without an effective loan review system; (3) accumulating a high level of criticized assets; (4) operating with inadequate capital; (5) operating with an inadequate allowance for loan and lease losses; and (6) operating without adequate supervision by its board and management. The examiner also cited a number of violations of law by Northwest.

In July 1987, the Dallas regional office of the Comptroller sent Northwest the final version of Toler's report and directed Northwest to formulate a remedial action plan and to determine a time to meet with representatives of the Dallas office. The Dallas office also instructed Northwest to provide copies of its corrective action plan to the Comptroller "in advance of the meeting." Comptroller's Exh. 17. Northwest did not give the Comptroller copies of a corrective action plan until the day of the meeting. Comptroller App. at G10; Northwest App. at 252. At the meeting, the Comptroller served Northwest with a notice of charges, *see* 12 U.S.C.A. § 1818(b)(1),[1] and notified Northwest that it planned to seek a cease and desist order.[2]

The bank answered the charges, and the case proceeded to hearing before an administrative law judge. After that hearing, the ALJ's findings were submitted to the Comptroller. The Comptroller concluded that a cease and desist order should be issued against Northwest for following various unsafe and unsound banking practices[3] and for violating various provisions

---

1. The section states, in relevant part, that:
   If, in the opinion of the appropriate Federal banking agency, any insured [bank] ... is engaging or has engaged, ... in an unsafe or unsound practice in conducting the business of such depository institution, or is violating or has violated ... a law, rule, or regulation, or any condition imposed in writing by the agency in connection with the granting of any application or other request by the depository institution or any written agreement entered into with the agency, the agency may issue and serve upon the depository institution or such party a notice of charges in respect thereof.
   12 U.S.C.A. § 1818(b)(1).

2. Concerning a cease and desist order, the section states that:
   [I]f upon the record made at any such [administrative] hearing, the agency shall find that any violation or unsafe or unsound practice specified in the notice of charges has been established, the agency may issue and serve upon the [bank] ... an order to cease and desist from any such violation or practice. Such order may, ... require the [bank] or its institution-affiliated parties to cease and desist from the same, and, further, to take affirmative action to correct the conditions resulting from any such violation or practice. 12 U.S.C.A. § 1818(b)(1).

3. The listed unsafe and unsound practices included: (1) failure to effectively manage the Bank's loan portfolio; (2) accumulation of a high level of criticized assets; (3) accumulation of a high level of loans unsupported by satisfactory credit information; (4) failure to monitor, structure and collateralize loans; (5) operation without an adequate loan review system; (6) operation with an inadequate allowance for loan and lease losses; and (7) operation with an inadequate level of capital. ALJ's Decision at 76–78; *In re Northwest Nat'l Bank,* AA–EC–87–

of the banking laws and regulations, including 12 C.F.R. § 7.3025 (1987) and 12 U.S.C. § 29 (1982), 12 U.S.C. § 161 (1982) (current version at 12 U.S.C.A. § 161 (West 1989 & Supp.1990)), and 12 U.S.C. § 371c (1982).[1] Comptroller's Decision at 11–12.

Under 5 U.S.C. § 706(2) (1988), we may modify, terminate, or set aside a cease and desist order only if we conclude that the Comptroller's action is:

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

*Id.*

## I.

Northwest argues that there is no substantial evidence in the record to support the Comptroller's determination of the level of assets properly classified at the 1987 examination and that, therefore, that determination and all conclusions dependent on it must be set aside.

■ In considering Northwest's attacks on the sufficiency of the evidence to support the cease and desist order, we determine only whether the Comptroller's decision is supported by substantial evidence on the record as a whole. *See First Nat'l Bank of Eden v. Department of the Treasury,* 568 F.2d 610, 611 (8th Cir.1978) (per curiam).

Northwest argues that the Comptroller's Office did not introduce evidence to establish the overall level of classified loans, including those loans whose classifications were not individually examined at the hearing. The overall level of classified loans is a cornerstone of the Comptroller's decision to issue the cease and desist order, since not only was it the explicit basis of Article V of the Notice of Charges against the bank, but also related to other charges, such as whether the bank had practiced good loan administration, set aside a sufficient loan loss reserve, and maintained sufficient capital. *See* Notice of Charges, Art. IV, X and XI.

Northwest made this objection to the sufficiency of the evidence in front of the ALJ, who overruled it on two grounds: first, that the parties had entered a stipulation that the Comptroller would only have to "have evidence of facts regarding the classifications" that were in dispute, ALJ's Decision at 8; and second, that one of the Bank's experts appeared to agree with all the classifications except the three for which specific evidence was admitted, *id.* The ALJ found that the classifications were proper, with the exception of one classification. *Id.* at 13. The Comptroller adopted the ALJ's conclusions regarding the stipulation and the loan classifications. Comptroller's Decision at 23, 24.

Northwest now argues that the stipulation did not appear in the administrative record and cannot therefore fill a gap in the Comptroller's evidence.

■ Our review of the record shows us that we need not determine the existence or effect of the stipulation, because the record is otherwise sufficient to establish the overall level of classified loans. Although the Bank successfully objected on best evidence grounds to some of the Comptroller's exhibits regarding the classified assets and the reasons for their classifications, *see, e.g.,* Comptroller's Exh. # 6 and Tr. at 25–26, the Bank allowed the Comptroller to enter another such document into evidence without any such objection. *See* Comptroller's Exh. # 7 and Tr.

---

123, slip op. at 114 (Comp.Gen. Jan. 13, 1989) ("Comptroller's Decision").

**4.** The statutes are given in the form in which they existed at the time of the Notice of Charges.

at 26–27. Comptroller's Exhibit Seven listed each classified loan and briefly identified the basis for criticizing the loan. Although the exhibit summarizes other documents and perhaps could not have passed muster under the hearsay rule had there been an objection, there was no such objection. *See* Fed.R.Evid. 103(a)(1).[5] Therefore, we conclude that the Comptroller adduced substantial evidence of the level of classified loans.

## II.

■ Northwest next argues that even if the record does support the classifications, it does not support a conclusion that unsafe and unsound banking practices caused the poor condition of those assets. Unsafe and unsound banking practices are defined as "conduct deemed contrary to accepted standards of banking operations which might result in abnormal risk or loss to a banking institution or shareholder." *First Nat'l Bank of Eden*, 568 F.2d at 611 n. 2. There is ample evidence in the record that Northwest followed unsound banking practices in connection with its lending function, and there is evidence that these problems occurred in connection with particular loans that were classified. *See, e.g.,* Comptroller's Exh. # 2 (inadequate loan review system failed to identify approximately 30 percent of loans criticized in examination). There was direct opinion evidence from Examiner Toler that the bank was causing its own loan problems. For instance, in one document Toler stated to the Northwest board that "[d]eficiencies in credit supervision remain a major cause of loan problems." Comptroller's Exh. # 17; Tr. at 96. The inference of a causal connection between the unsafe lending practices and the poor state of the loan portfolio is quite logical. "The finding of unsafe practices and of a causal connection to the high level of classified loans is supported by substantial evidence on the record as a whole, and we affirm it." *First Nat'l Bank of Gordon v. Department of the Treasury*, 911 F.2d 57, 64 (8th Cir.1990).

■ Similarly, Northwest argues that there is no substantial evidence that the level of credit exceptions in Northwest's loan portfolio and the level of capital maintained by the bank were the result of unsound banking practices. The Comptroller introduced evidence that the bank had credit exceptions in nineteen percent of its loan files. Tr. at 49. Northwest's expert agreed that the level was high. Tr. at 409. Northwest argues that mere evidence of the high level of files with incomplete documentation does not constitute proof that the poor documentation was the bank's fault. We disagree, and conclude that the Comptroller was entitled to infer that the bank's practices contributed to this widespread pattern of inadequate documentation. The bank offered evidence tending to show that the lack of current financial statements was due to the fact that the Comptroller examined the bank during tax season, when the accounting profession is too busy to supply its customers with updated financial statements. The Comptroller was simply not obliged to accept this excuse.

■ The bank also argues that there was not substantial evidence that its level of capital was unsafe. The Comptroller based his decision about the level of capital Northwest needed on record evidence that the bank's poor financial condition necessitated a higher level of capitalization than the bank had maintained, to provide a cushion for possible losses. Tr. at 77. We are convinced his decision had adequate support in the record and that this case is therefore distinguishable from *First National Bank of Bellaire v. Comptroller of the Currency*, 697 F.2d 674, 687 (5th Cir. 1983).

---

5. Although the ALJ and the Comptroller both refer to the Comptroller's failure to "[place] into evidence the underlying facts for all the classified loans," Comptroller's Decision at 21, and ALJ Decision at 8, they appear merely to have been referring to the fact that the evidence ad-

duced was a summary, not the underlying records of the transactions. Therefore, we do not understand these comments to represent a conclusion that there was no evidence in the record of the level of classified assets.

In sum, we conclude that substantial evidence in the record supports the Comptroller's findings that Northwest engaged in unsafe and unsound banking practices.

### III.

Northwest argues that Comptroller erred in finding it in violation of 12 U.S.C. §§ 29, 161, and 371c. We consider in turn each of the violations found by the Comptroller.

### A.

■ The Comptroller found Northwest in violation of 12 C.F.R. § 7.3025 and thereby in violation of 12 U.S.C. § 29. 12 U.S.C. § 29 requires national banks to dispose of property acquired through foreclosure within five years, unless given permission by the Comptroller to hold it longer. Such property is referred to as "other real estate owned," and, under 12 C.F.R. § 7.3025(e), banks are required to maintain documentation concerning their "continuing and diligent efforts" to dispose of such property. The bank must also obtain a fair market value appraisal of the property, conducted by an independent, qualified appraiser on the basis of written instructions from the bank. Section 7.3025(g)(1). Northwest foreclosed on a certain parcel owned by Mr. and Mrs. McBee and transferred it into an "other real estate" account on September 10, 1984. Northwest had the property appraised without providing the appraiser written instructions and without explaining the format or criteria to be used. Northwest then entered into a lease-purchase agreement with the McBees, who were to obtain financing elsewhere to repurchase the property. The McBees were unable to get financing to repurchase the property,

and on February 2, 1987 Northwest listed the property with a realtor.

The Comptroller concluded that waiting almost three years for the McBees to get financing did not constitute continuing and diligent efforts by Northwest to dispose of the property. Therefore, he found that the bank had failed to comply with 12 U.S.C. § 29 and 12 C.F.R. § 7.3025(e). Comptroller's Decision at 83. He also found Northwest had failed to give the appraiser written instructions and had thereby violated 12 C.F.R. § 7.3025(g)(1)(ii).[6] Comptroller's Decision at 83.

■ Northwest argues that 12 C.F.R. § 7.3025 is simply an interpretive ruling that does not have the force of law. Consequently, it argues, violation of section 7.3025 cannot form the basis for a cease and desist order.

First, we reject Northwest's argument that the Comptroller did not have power to make legislative regulations before the passage of 12 U.S.C. § 93a (1988). *See Independent Bankers Ass'n v. Heimann*, 613 F.2d 1164, 1169 & n. 15 (D.C.Cir.1979), *cert. denied*, 449 U.S. 823, 101 S.Ct. 84, 66 L.Ed.2d 26 (1980); *Lincoln Sav. & Loan Ass'n v. Federal Home Loan Bank Bd.*, 856 F.2d 1558, 1563 (D.C.Cir.1988).[7]

Secondly, we hold that, despite the Comptroller's labeling of Section 7.3025 as an interpretive rule, *see* 44 Fed.Reg. 46428 (Aug. 8, 1979), its nature and history show that it should be construed as a legislative rule, violation of which may form the basis for a cease and desist order.

An agency's labeling a regulation as "interpretive" or "legislative" is only one factor (albeit an important one) to be con-

---

**6.** The ALJ, on the contrary, had found that Northwest had been reasonably diligent in its efforts to dispose of the property. ALJ's Decision at 49. He also held 12 C.F.R. § 7.3025 to be an interpretive ruling, which could not form the basis for a cease and desist order. *Id.* at 46.

**7.** *Heimann* holds that the Comptroller has authority to adopt legislative regulations under section 1818(b), relating to prevention of unsafe and unsound practices. In holding that the Comptroller thus had authority to adopt regulations to prevent unsafe and unsound handling of "other real estate," we are aware that the

Comptroller found it unnecessary to show that the bank's failure to comply with the written appraisal instructions requirement was an "unsafe and unsound practice." Comptroller's Decision at 83. This is not inconsistent with our holding. The Comptroller's decision is based on violation of the legislative requirements of 12 C.F.R. § 7.3025. Once there has been a finding that the regulation was violated, it is not necessary to conclude that the violation constituted an unsafe and unsound practice in its own right in order to uphold the cease and desist order.

sidered in characterizing a rule. *See Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*, 874 F.2d 205, 207 (4th Cir.1989). "[C]ourts are in general agreement that interpretive rules simply state what the administrative agency thinks the statute means, and only 'remind' affected parties of existing duties. In contrast, a substantive or legislative rule, pursuant to properly delegated authority, has the force of law, and creates new law or imposes new rights or duties." *Id.* (citations omitted). Section 7.3025 clearly purports to create new substantive requirements, and therefore is in character a legislative rule.

Moreover, the Comptroller gave notice and solicited comments when section 7.3025 was proposed, 43 Fed.Reg. 41406 (Sept. 18, 1978); 43 Fed.Reg. 2881 (Jan. 20, 1978); 41 Fed.Reg. 8490 (Feb. 27, 1976), as is required for promulgation of a legislative rule. 5 U.S.C. § 553(b) (1988).

Therefore, we conclude that the Comptroller appropriately accorded section 7.3025 the force of law and based issuance of the cease and desist order on it.

### B.

Under 12 U.S.C. § 161, all national banks are to file call reports of condition and income with the Comptroller on a regular basis. These reports serve to inform the Comptroller of the resources and liabilities of individual banks on a particular day at the end of each calendar quarter and aid the Comptroller in determining what supervisory attention each bank requires. These reports must be filed with the Comptroller on a periodic basis; declared true by the bank officer designated by the bank board of directors; and signed by three members of the bank's board of directors, who, with their signatures, state that "the report has been examined by them and to the best of their knowledge and belief is true and correct." 12 U.S.C. § 161(a). A bank's filing of inaccurate call reports has been held to be a violation of law within the meaning of section 1818(b). *First Nat'l Bank of Gordon*, 911 F.2d at 64.

Northwest filed one of these reports on March 31, 1987. The Comptroller found that this report failed to accurately report the amount necessary for Northwest's allowance for loan and lease loss, Northwest's liability on a letter of credit, and Northwest's income tax expense paid to its holding company, Northwest Bancorporation of Arkansas, Inc. ALJ's Decision at 69–70; Comptroller's Decision at 110. This misstatement of the loan loss reserve inflated Northwest's earnings figure. The Comptroller concluded that filing the incorrect report violated 12 U.S.C. § 161 and constituted an unsafe and unsound banking practice, and thereby justified the issuance of a cease and desist order. Comptroller's Decision at 75–77.

Northwest argues that the discrepancy between the allowance for loan and lease losses actually shown in the call report and the amount the Comptroller found to be correct is the result of honest disagreement and therefore cannot be the basis for a cease and desist order.

We point out first that the call report was inaccurate in two ways that do not appear to be covered by Northwest's argument—the omission of liability for a $100,000 letter of credit and omission of income tax expense paid to the bank's holding company. Comptroller Exh. # 18; Tr. at 120. Moreover, the inadequacy of the allowance for loan and lease losses was not a matter in dispute, since the bank's board had acknowledged prior to the filing of the call report that it was necessary to transfer an additional $400,000 into the loss reserve, but had simply failed to have the transfer effected before the call report was filed. Tr. at 192–98.

We have recently held that even where a bank's officials reasonably (but erroneously) believed the allowance for losses was accurate, misstatement of that figure in a call report constitutes a violation of section 161 and thus supports the issuance of a cease and desist order. *First Nat'l Bank of Gordon*, 911 F.2d at 64.

In this case there was evidence not only that the allowance was inadequate, but also that the directors knew it when the call report was filed. Substantial evidence on

the record as a whole supported the Comptroller's determination that Northwest had violated section 161.

### C.

■ The Comptroller found Northwest to be acting in violation of 12 U.S.C. § 371c, based on his conclusion that the bank had loaned money to an affiliate, collateralized by the securities of that affiliate. The facts of this matter are not disputed. A Northwest bank director, Joe B. Morris, Sr., individually or jointly owned 5.98% of the bank's common stock and 24.18% of the stock in the bank's holding company. At the time, the holding company owned 82.04 percent of Northwest's common stock. Morris also owned fifty percent of the stock of Houston Taylor Motors, and his wife, Virginia Morris, Northwest's chief executive officer, owned the remaining fifty percent. On November 14, 1986, Northwest made a $200,000 loan to William T. Higgs to purchase twenty-five percent of Houston Taylor Motors from Joe B. Morris, Sr. The loan represented one hundred percent of the purchase price and was secured by Higgs' Houston Taylor stock. Northwest admitted that the transaction constituted an infusion of capital to Houston Taylor Motors. Comptroller's Request for Admission # 25 and Northwest's Answer.

Under 12 U.S.C. § 371c(a)(1) a member bank of the federal reserve system may not loan its "affiliate" money unless the collateral for the loan meets certain requirements. The collateral may not be securities of the affiliate. 12 U.S.C. § 371c(c)(4). A loan to a person is deemed a loan to the affiliate if the proceeds are used for the benefit of the affiliate. Section 371c(a)(2). Thus, if Northwest and Houston Taylor are affiliates, the loan, constituting an infusion of capital into Houston Taylor and secured by Houston Taylor stock, violates section 371c(c)(1).

The definition of "affiliate" in section 371c covers "any company that is controlled directly or indirectly, by a trust or otherwise, by or for the benefit of shareholders who beneficially or otherwise control, directly or indirectly ..., the member bank or any company that controls the member bank." 12 U.S.C. § 371c(b)(1)(C)(i). A shareholder is deemed to have control over a company if, among other tests, "such ... [a] shareholder, directly or indirectly, ... owns, controls or has power to vote 25 per centum or more of any class of voting securities of the other company." Section 371c(b)(3)(A)(i).

The Comptroller held that Morris' indirect ownership of bank stock through the holding company and his direct ownership of bank stock should be aggregated when applying the twenty-five percent ownership test. Comptroller's Decision at 89. Therefore, adding his 24.18 percent ownership of the holding company's 82.04 percent of bank common stock and his 5.98 percent direct ownership of bank stock, Morris was deemed to own 25.82 percent of the bank's common stock. *Id.* Consequently, the Comptroller treated Northwest and Houston Taylor as affiliates and held the bank had unlawfully made a loan for the benefit of Houston Taylor secured only by Houston Taylor stock. *Id.* at 90.

Northwest argues that Morris' ownership of bank holding company stock and bank stock should not be aggregated to arrive at the twenty-five percent figure, since he did not have "control" of either the holding company or the bank itself.

Our review of the language of section 371c and contemplation of its purposes convince us that Congress meant to throw a wide net indeed, which the Comptroller may reasonably interpret to catch this transaction.

The objective of section 371c is to prevent the misuse of bank resources that might result from financial transactions between a bank and its affiliates. *See Senate Report on Garn–St. Germain Depository Institutions Act of 1982*, S.Rep. No. 97–536, 97th Cong., 2d Sess. 30–32 *reprinted in* 1982 U.S.Code Cong. & Admin.News 3054, 3084–86. This objective is met by establishing collateral requirements, prohibiting unsafe and unsound banking practices, and prohibiting bank purchases of low quality assets from affiliates. *See id.*

It is obvious that Congress intended to sweep broadly with its statutory definition of "control," since it chose a percentage ownership (twenty-five) that is much less than actual mathematical control (more than fifty percent), without providing for inquiry as to whether a twenty-five percent owner in a given bank actually wields control of the bank. In light of the goals of section 371c, Congress' reference to "direct or indirect" ownership can reasonably be interpreted as broadly as the Comptroller construes it. We therefore uphold his conclusion that Northwest violated Section 371c in the Houston Taylor transaction.

## IV.

Finally, Northwest argues that the Comptroller's actions prior to its hearing on September 18, 1987, denied the bank its due process rights. Northwest maintains that its due process rights were denied when the Comptroller: (1) denied the bank a meaningful opportunity to settle its disputes with the agency as required by 5 U.S.C. § 554(c)(1) (1988); (2) set out a procedure for the bank to follow and then denied the bank an opportunity to show its compliance with the procedure; and (3) used his authority to seek a cease and desist order in an attempt to remove members of Northwest's board of directors to circumvent the standard of proof required in removal proceedings. After carefully considering the record, we conclude that Northwest's due process rights were not violated and, accordingly, we need not consider them further.

## V.

We affirm issuance of the cease and desist order and dismiss Northwest's due process claim.