# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-2270

_____

The School of the Ozarks, Inc., doing business as College of the Ozarks,

*Plaintiff - Appellant,*

v.

Joseph R. Biden, Jr., in his official capacity as President of the United States; U.S. Department of Housing and Urban Development; Marcia L. Fudge, in her official capacity as Secretary of the U.S. Department of Housing and Urban Development; Demetria L. McCain, in her official capacity as Principal Deputy Assistant Secretary for Fair Housing & Equal Opportunity of the U.S. Department of Housing and Urban Development,[1]

*Defendants - Appellees.*

------------------------------

Institute for Faith and Family; America First Legal Foundation; Mountain States Legal Foundation; State of Missouri; State of Alabama; State of Arkansas; State of Indiana; State of Kansas; State of Kentucky; State of Louisiana; State of Montana; State of Nebraska; State of South Carolina; State of Tennessee; State of Texas; State of Utah; State of West Virginia; Hannibal-LaGrange University; Missouri

------

[1]Ms. McCain is substituted for Jeanine M. Worden under Federal Rule of Appellate Procedure 43(c). The complaint sued Worden in her official capacity as Acting Assistant Secretary, but that office is now vacant, and under the Department's Order of Succession, the Principal Deputy Assistant Secretary exercises the powers and performs the duties of the Assistant Secretary.

Baptist University; Southwest Baptist University; Christian Life Commission of the Missouri Baptist Convention,

*Amici on Behalf of Appellant(s).*

_____

Appeal from United States District Court
for the Western District of Missouri - Springfield

_____

Submitted: November 17, 2021
Filed: July 27, 2022

_____

Before COLLOTON, GRASZ, and KOBES, Circuit Judges.

_____

COLLOTON, Circuit Judge.

College of the Ozarks, a private Christian college in Missouri, brought this action to challenge the lawfulness of a memorandum issued by an acting assistant secretary of the United States Department of Housing and Urban Development. The College moved for a temporary restraining order and preliminary injunction. The district court[2] ruled that the College lacked standing to establish a case or controversy and dismissed the action for lack of jurisdiction. The College appeals, and we affirm.

I.

On June 15, 2020, the Supreme Court decided *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), concerning Title VII of the Civil Rights Act of 1964. *Bostock*

_____

[2]The Honorable Roseann A. Ketchmark, United States District Judge for the Western District of Missouri.

held that the statute's prohibition on employment discrimination "because of sex" encompasses discrimination on the basis of sexual orientation and gender identity. *Id.* at 1741.

The Fair Housing Act, at issue in this appeal, makes it unlawful for certain persons and entities to "make unavailable or deny" a dwelling "because of . . . sex." 42 U.S.C. § 3604(a). In January 2021, President Biden issued Executive Order No. 13,988, which states that "[u]nder *Bostock*'s reasoning, laws that prohibit sex discrimination—including . . . the Fair Housing Act . . . prohibit discrimination on the basis of gender identity or sexual orientation."

The following month, the Acting Assistant Secretary for Fair Housing and Equal Opportunity in the Department of Housing and Urban Development issued a memorandum to implement the Executive Order. The Memorandum is addressed to the Department's Office of Fair Housing and Equal Opportunity, as well as state and local agencies and private organizations that administer and receive funds through certain programs of the Department. The document explains that the Office of General Counsel for the Department "has concluded that the Fair Housing Act's sex discrimination provisions are comparable to those of Title VII and that they likewise prohibit discrimination because of sexual orientation and gender identity."

The Memorandum directs the Office of Fair Housing and Equal Opportunity—the HUD office that enforces the Fair Housing Act—to "accept for filing and investigate all complaints of sex discrimination, including discrimination because of gender identity or sexual orientation." The document's stated purpose is to direct the Office to "fully enforce the Fair Housing Act" because discrimination based on sexual orientation and gender identity "is real and urgently requires enforcement action."

The Memorandum explained that over the previous ten years, HUD interpreted the Fair Housing Act to prohibit discrimination on the basis of gender identity and sexual orientation when the discrimination was motivated by perceived nonconformity with gender stereotypes.[3] Yet the Memorandum concluded that this "limited enforcement" was "insufficient to satisfy the Act's purpose" and was "inconsistent" with the broader rationale of *Bostock*. Hence, the Department's leadership issued this new directive "to fully enforce" the Act's prohibitions against discrimination based on sex, including sexual orientation and gender identity. The Memorandum addresses discrimination in housing across the entire economy, and does not specifically address the subject of housing for students at colleges and universities.

College of the Ozarks is a Christian undergraduate institution in Missouri. The College admits students of any religion, but all students must agree to follow the College's religiously-inspired code of conduct. As stated in that code, the College teaches that biological sex is a person's "God-given, objective gender, whether or not it differs from their internal sense of 'gender identity.'" The code also states that "sexual relations are for the purpose of the procreation of human life and the uniting and strengthening of the marital bond in self-giving love, purposes that are to be achieved solely through heterosexual relationships in marriage." In accordance with these beliefs, the College maintains single-sex residence halls and does not allow members of one sex to visit the "living areas" of members of the opposite sex. The College therefore prohibits biological males who "identify" as females from living

---

[3]*See* Equal Access in Accordance With an Individual's Gender Identity in Community Planning and Developmental Programs, 81 Fed. Reg. 64,763, 64,770 (Sept. 21, 2016); Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act, 81 Fed. Reg. 63,054, 63,058-59 (Sept. 14, 2016); Equal Access to Housing in HUD Programs Regardless of Sexual Orientation or Gender Identity, 77 Fed. Reg. 5661, 5666 (Feb. 3, 2012).

in female dormitories, and vice-versa. The College regularly communicates its housing policies to current and prospective students through a student handbook, an online virtual tour, the school website, and in-person recruitment events.

Allegedly fearing that its housing policies are now unlawful under the Memorandum's interpretation of the Fair Housing Act, the College sued President Biden, the Department of HUD, the Secretary of HUD, and the Acting Assistant Secretary, seeking pre-enforcement review of the Memorandum. The complaint alleged that the Memorandum, among other things, violates the Administrative Procedure Act, the First Amendment's Free Speech and Free Exercise Clauses, the Appointments Clause of Article II of the Constitution, and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*

The complaint sought injunctive and declaratory relief. Specifically, it asked the district court to "set aside" the Memorandum and issue an injunction against enforcement of the Memorandum by the defendant officials. The complaint sought, among other forms of relief, a declaration that the Fair Housing Act and the implementing regulations do not prohibit discrimination based on sexual orientation or gender identity. The College moved for a temporary restraining order and preliminary injunction.

The district court concluded that it lacked jurisdiction because the College failed to establish Article III standing. The court determined that any alleged injury is not concrete because the College did not show that the Memorandum imposed restrictions on private housing providers such as the College. The court further reasoned that any injury was not caused by the Memorandum because the internal directive does not modify the College's rights or obligations under the Fair Housing Act. The court also concluded that any judicial remedy would not redress any alleged injury because any liability that the College incurs for violating the Fair Housing Act "would flow directly from the Act itself, as well as applicable case law including

*Bostock*, and not from the Memorandum." The College appeals, and we review the district court's decision *de novo*.

## II.

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (internal quotation and alteration omitted). To establish Article III standing, a party invoking federal jurisdiction must show (1) that the plaintiff suffered an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) that a favorable decision will likely redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). An injury in fact is the invasion of a legally protected interest that is "actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal quotation omitted). "Allegations of possible future injury do not satisfy the requirements of Article III. A threatened injury must be certainly impending to constitute injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (internal quotation omitted).

A plaintiff who invokes federal jurisdiction must support each element "in the same way as any other matter" on which it bears the burden of proof. *Lujan*, 504 U.S. at 561. At the pleading stage, therefore, a plaintiff must "allege sufficient facts to support a reasonable inference that [it] can satisfy the elements of standing." *Animal Legal Def. Fund v. Vaught*, 8 F.4th 714, 718 (8th Cir. 2021).

The closely related doctrine of ripeness originates from the same Article III limitation. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014). The ripeness requirement serves "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference

-6-

until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148-49 (1967). To demonstrate that an alleged dispute is ripe for review, the complainant must show both "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149. A case is fit for judicial decision when it would not benefit from further factual development and poses a purely legal question not contingent on future possibilities. *Pub. Water Supply v. City of Peculiar*, 345 F.3d 570, 573 (8th Cir. 2003). In this case, standing and ripeness essentially "boil down to the same question," and we will address the issue in terms of "standing." *See Susan B. Anthony List*, 573 U.S. at 157 n.5; *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 128 n.8 (2007).

A.

The College first argues that it has suffered an injury in fact because there is an imminent threat under the Memorandum that the government will enforce the Fair Housing Act against the College. This imminent threat of enforcement, says the College, requires it to choose among three injuries: (1) change its housing policies in violation of the College's religious beliefs, (2) refuse to change its housing policies and face sanctions under the Fair Housing Act, or (3) cease providing student housing altogether. The College cites the Memorandum's call for "full enforcement" of the Act to overcome the insufficiency of past "limited enforcement of the Fair Housing Act's sex discrimination prohibition." The College contends that the Memorandum necessarily directs the agency to bring an allegation of sex discrimination against the College to "eliminate discriminatory housing practices."

This theory of injury fails because it is based on a misunderstanding of the Memorandum. The Memorandum does not impose any restrictions on, or create any penalties against, entities subject to the Fair Housing Act. Rather, the Memorandum directs the Office of Fair Housing and Equal Opportunity to "accept for filing and

-7-

investigate all complaints of sex discrimination, including discrimination because of gender identity or sexual orientation." The Memorandum does not, as the College presupposes, require that HUD reach the specific enforcement decision that the College's current housing policies violate federal law. The Memorandum, for example, says nothing of how the Religious Freedom Restoration Act or the Free Exercise Clause may limit enforcement of the Fair Housing Act's prohibition on sex discrimination as applied to the College. *Bostock* itself, the decision on which the Memorandum is based, refers to the Religious Freedom Restoration Act as a "super statute, displacing the normal operation of other federal laws." *Bostock*, 140 S. Ct. at 1754.

The College's alleged injury also lacks imminence because it is speculative that HUD will file a charge of discrimination against the College in the first place. As explained in the government's brief, the agency has never filed such a charge against a college for sex discrimination based on a housing policy that is specifically exempted from the prohibition on sex discrimination in education under Title IX of the Civil Rights Act. Title IX provides that its anti-discrimination provision "shall not apply to an educational institution which is controlled by a religious organization," if applying the prohibition "would not be consistent with the religious tenets of" the organization. 20 U.S.C. § 1681(a)(3). In 2018, the assistant secretary for civil rights in the U.S. Department of Education formally advised the College that it is exempt from numerous regulatory provisions on housing and other matters, insofar as they proscribed discrimination based on sexual orientation or gender identity, to the extent that compliance would conflict with the College's religious tenets. Consistent with that exemption, even when HUD interpreted the Fair Housing Act to prohibit discrimination on the basis of sexual orientation and gender identity between 2012 and 2020, the Department brought no enforcement action against the College. The College's enjoyment of an exemption under Title IX, and its failure to show that HUD has previously filed discrimination charges against it or similarly

situated colleges, substantially undermines its argument that enforcement is imminent now. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411 (2013).

Similarly unpersuasive is the College's assertion that it is the "object of the action" in the Memorandum, and that there is thus "little question" that the Memorandum causes injury. *See Lujan*, 504 U.S. at 561-62. Relying on the ripeness decision in *Abbott Laboratories*, the College argues that it is the object of an agency action because the Memorandum (1) is directed at the College in particular, (2) requires the College to make significant changes to its housing policies, and (3) exposes the College to strong sanctions. *See* 387 U.S. at 154. But this assertion overlooks that the Memorandum is an internal directive to HUD agencies, not a regulation of private parties. The Memorandum does not direct the College to do anything, and it does not expose the College to any legal penalties for noncompliance with the Memorandum. In *Abbott Laboratories*, by contrast, the plaintiff drug manufacturers were the object of a final administrative rule that required them to place a particular name on drug labels. The rule directly regulated the conduct of drug manufacturers and was backed by criminal and civil sanctions if not followed. *Id.* at 152-54.

The College is more like the plaintiff in *Cornish v. Blakey*, 336 F.3d 749 (8th Cir. 2003). There, a memorandum issued by the Department of Transportation (DOT) directed doctors who conducted drug testing how to decide whether a specimen was adulterated. *Id.* at 751. The Federal Aviation Administration (FAA) revoked the plaintiff Cornish's aircraft mechanic certificate when doctors determined that he submitted an adulterated urine specimen. Before the mechanic exhausted his administrative remedies, he brought a challenge to the DOT memorandum in federal court. *Id.* at 752. This court held that the plaintiff "was not even arguably injured by the 1998 DOT memorandum until the FAA relied upon it as a basis for revoking his mechanic certificate," and that "absent the revocation order, Cornish lacks the injury in fact necessary for Article III standing." *Id.* at 752-53. The College lacks injury for

analogous reasons. The HUD enforcement agencies have not relied on the Memorandum to charge the College with sex discrimination under the Fair Housing Act, and any alleged future injury caused by the Memorandum is conjectural and hypothetical.

The dissent favors a different theory of injury—namely, that the College was deprived of a right to notice and opportunity for comment before HUD issued the internal directive. But even assuming that notice and comment was required, a plaintiff cannot establish injury in fact "on the basis of a 'procedural right' unconnected to the plaintiff's own concrete harm." *Lujan*, 504 U.S. at 573 n.8. Like the Memorandum itself, the absence of notice and opportunity to comment regarding the Memorandum does not endanger a concrete interest of the College, because the Memorandum does not require HUD to determine that the College's housing policies violate federal law. "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

In sum, the College's alleged injury is too speculative to establish Article III standing. The College, in effect, asks us to assume that the following series of events is imminent: a sex-discrimination complaint will be filed against the College based on claims involving sexual orientation or gender identity; following an investigation, HUD will charge the College with sex discrimination, even though HUD has never enforced the Fair Housing Act's sex-discrimination prohibition against a college whose housing policies have been exempted from the prohibition on sex discrimination under Title IX; HUD will determine, pursuant to the Memorandum, that the College is not entitled to an exemption under the Religious Freedom Restoration Act or the Free Exercise Clause as discussed in *Bostock*; and the College will therefore be subject to penalties. This is the kind of "highly attenuated chain of

possibilities" that "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410.

B.

The College also advances a second theory of injury—namely, that the Memorandum curtails its First Amendment right to freedom of speech. A plaintiff claiming an abridgment of free speech is permitted to seek pre-enforcement review "under circumstances that render the threatened enforcement sufficiently imminent." *Susan B. Anthony List*, 573 U.S. at 159. To establish standing, a complaint must allege that plaintiff has "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.* (internal quotation omitted). A plaintiff can establish an injury in the First Amendment context in two ways: by identifying protected speech in which it would like to engage but that is proscribed by statute, or by self-censoring to avoid the credible threat of prosecution. *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016).

The Fair Housing Act makes it unlawful to "make, print, or publish" a statement regarding the sale or renting of a dwelling that discriminates on the basis of sex. 42 U.S.C. § 3604(c). The College argues that, according to the Memorandum, the Fair Housing Act prohibits the College from communicating its housing policies, because those policies require that biological males and females, regardless of gender identity or sexual orientation, reside in separate dormitories. In asserting a credible threat of enforcement, the College again cites the Memorandum's call for "full enforcement" of the Fair Housing Act to bring about the "eradication of housing discrimination for all."

The College's free-speech theory of standing fails essentially for the reasons discussed above: The College has not shown that there exists a credible threat that

-11-

the defendants will enforce the Fair Housing Act against the institution based on its religiously-based housing policies. The Memorandum does not make the College's housing policies unlawful without regard to legal protections for religious liberty. HUD has never filed charges of housing discrimination against a college that is exempt from prohibitions on sex discrimination in housing under Title IX. And HUD has never enforced the Fair Housing Act's sex-discrimination prohibition against the College, even though the agency interpreted the Fair Housing Act to prohibit discrimination on the basis of sexual orientation and gender identity between 2012 and 2020. Thus, the College's free-speech theory does not allege an injury in fact sufficient to confer Article III standing.

Aside from the lack of a credible threat of enforcement, the College also has not alleged that its speech has been chilled. The College alleges no self-censorship, but rather avers that it "tells and intends to continue telling current and prospective students" about its religiously-inspired housing policies. Although the complaint states that the Memorandum "chills the speech of colleges," it alleges no facts to support that legal conclusion, and we "are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation omitted). The College has not alleged, for example, that it no longer separates males and females into dormitories based on biological sex, or that it has repealed the portion of the student handbook that communicates its housing policies. The complaint thus fails to allege either an actual chilling of speech or a credible threat of enforcement that justifies self-censorship.

C.

Even if the College had suffered an injury in fact, it must also show that a favorable judicial decision would likely redress its injury. Redressability requires us to examine the "causal connection between the alleged injury and the judicial relief requested." *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984). Therefore, even if we

assume for the sake of analysis that the College has suffered the injuries it alleges, the College must show that the requested relief would eliminate the alleged threat of imminent enforcement of the Fair Housing Act and prevent any chill of the College's speech.

An injunction against implementing the Memorandum, however, would not stop the Department from investigating all complaints of sex discrimination against a college, including complaints of discrimination because of gender identity or sexual orientation. Even if HUD were enjoined from enforcing its internal directive, the agency would still be required by statute to investigate sex-discrimination complaints filed against the College. The statute mandates that when a complaint is filed, HUD "shall make an investigation of the alleged discriminatory housing practice." 42 U.S.C. § 3610(a)(1)(B)(iv). With or without the Memorandum, the agency must consider the meaning of the Fair Housing Act in light of *Bostock* and its interpretation of similar statutory language. The College has thus failed to show that enjoining officials from implementing the Memorandum would redress any injury allegedly arising from the internal directive, because the agency retains the authority and responsibility to carry out the same enforcement activity based on the statute alone.

\* \* \*

For these reasons, the judgment of the district court is affirmed.

GRASZ, Circuit Judge, dissenting.

This case highlights the corrosive effect on the rule of law when important changes in government policy are implemented outside the normal administrative process. The normal method for rulemaking requires notice and comment, which in turn "secure the values of government transparency and public participation." *Iowa*

*League of Cities v. EPA*, 711 F.3d 844, 873 (8th Cir. 2013). An agency's issuance of a guidance document that fails to adhere to the proper administrative procedures may achieve compliance with the government's desired policy outcomes by in terrorem means, but it skirts the rule of law and undermines our values. This is especially true where regulated entities are placed under a sword of Damocles but are denied access to the courts because the sword has not yet fallen. "An agency operating in this way gains a large advantage"—it enables the agency to quickly amend its rules without following the statutory procedures. *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1020 (D.C. Cir. 2000). "The agency may also think there is another advantage—immunizing its lawmaking from judicial review." *Id.*

Here, the College fears the federal government will imminently enforce HUD's interpretation of the Fair Housing Act ("FHA") against the College if the College continues its current housing policy that assigns students to single-sex dorms according to their biological sex. The court dismisses this fear as "speculative" and contends there is no "credible threat of enforcement." *Ante* at pp. 8, 11. It therefore concludes we lack standing to review HUD's Memorandum directing the Office of Fair Housing and Equal Opportunity ("FHEO") and associated entities to "fully enforce" the federal government's interpretation of the FHA. I disagree with the court's conclusions and respectfully dissent.

Viewing the pleadings liberally, the complaint alleges the College's housing policy violates the government's interpretation of the FHA. Put simply, if the government acts as the Memorandum facially requires, it is only a matter of time before the government concludes the College's housing policy violates the FHA. The law should not require the College to wait for this to come to fruition. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) ("[W]e have permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent."). Nor do I believe the College must rely on the government's in-court oral suggestion that it would not enforce its interpretation of the FHA against

religious institutions based on its historic practice of following Title IX's religious exemption—an exemption not even mentioned in the broad language of the enforcement directive in the Memorandum. *See Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019) (noting that the government's "in-court assurances [that it will not fully enforce the law] do not rule out the possibility that it will change its mind and enforce the law more aggressively in the future").

That said, my main objection to the court's holding is more fundamental: the holding overlooks an injury the College has *already suffered*—the deprivation of its right to notice and comment. The FHA requires notice and comment for "all rules" under its purview—including interpretative rules.[4] 42 U.S.C. § 3614a. "[I]nterpretative rules simply state what the administrative agency thinks the statute means, and only remind affected parties of existing duties." *Iowa League of Cities*, 711 F.3d at 873 (quoting *Northwest Nat'l Bank v. U.S. Dep't of the Treasury*, 917 F.2d 1111, 1117 (8th Cir. 1990)).

In my view, HUD's Memorandum is an interpretative rule. The Memorandum explains HUD's interpretation of the FHA's "sex discrimination" language: "HUD's Office of General Counsel has concluded that [the FHA's] sex discrimination provisions . . . prohibit discrimination because of sexual orientation and gender identity." It then thrice directs FHEO and other relevant entities to so "interpret" the FHA's prohibition on sex discrimination. The Memorandum states what HUD thinks the statute means and instructs affected parties of their duties. These are the hallmarks of an interpretative rule. *See Iowa League of Cities*, 711 F.3d at 873. Interestingly, President Biden—author of the Executive Order prompting the

---

[4]The Administrative Procedure Act exempts interpretative rules from the notice and comment requirement "[e]xcept when notice or hearing is required by statute." 5 U.S.C. § 553(b). The notice and comment requirement under the FHA falls under this exception.

Memorandum—characterized the Memorandum as a "rule change." Proclamation No. 10,177, 86 Fed. Reg. 19,775 (Apr. 11, 2021). I agree and therefore believe the Memorandum is subject to the FHA's notice and comment requirement.

But even if we pretend the Memorandum is not what the President says it is, the College has an alternative basis for its procedural right to notice and comment. When HUD issued the Memorandum, a federal regulation required notice and comment for "significant guidance documents." 24 C.F.R. § 11.1(b) (2020). A guidance document included "a statement of general applicability, designed to shape or intended to have future effect on the behavior of regulated parties, that sets forth a policy on a statutory . . . issue, or an interpretation of a statute." *Id.* § 11.2(a) (2020). And a guidance document was "significant" if it could "reasonably be anticipated to . . . [r]aise novel legal or policy issues arising out of legal mandates [or] the President's priorities." *Id.* § 11.2(d)(4) (2020). While these regulations under 24 C.F.R. §§ 11.1 and 11.2 have since been revoked, *see* Implementing Executive Order 13992, 86 Fed. Reg. 35,391-01, at 35,392 (July 6, 2021), HUD was required to follow them while they "remain[ed] in force." *Voyageurs Region Nat'l Park Ass'n v. Lujan*, 966 F.2d 424, 428 (8th Cir. 1992).[5]

Here, HUD's Memorandum interpreted the FHA's prohibition on sex discrimination. It directed FHEO to "accept for filing and investigate *all* complaints of sex discrimination" based on "gender identity or sexual orientation" (emphasis added). It called HUD's prior FHA enforcement "limited," "insufficient," and "inconsistent" with *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020). It sought to

---

[5]As one court recently stated: "Under deeply rooted principles of administrative law, not to mention common sense, government agencies are generally required to follow their own regulations. When agencies fail to do so, the APA (as developed by case law) gives aggrieved parties a cause of action to enforce compliance." *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020) (internal citations omitted).

rectify denials of "the constitutional promise of equal protection under the law" for transgender individuals "throughout most of American history." It specified its requirements arose from the Supreme Court's *Bostock* decision and President Biden's priorities articulated in Executive Order 13,988. In short, if the Memorandum is not an interpretative rule, it is at minimum a significant guidance document. It strains credulity to say otherwise.

Whether the Memorandum was an interpretative rule or a significant guidance document, the complaint plausibly alleged HUD deprived the College of its right to notice and comment. Such deprivation constitutes an injury in fact sufficient for standing if the notice and comment right was "designed to protect some threatened concrete interest of" the College. *Iowa League of Cities*, 711 F.3d at 870–71 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 n.8 (1992)). At this stage of the proceedings, I would conclude the notice and comment right was designed to protect a threatened concrete interest of the College. *See Am. Farm Bureau Fed'n v. EPA*, 836 F.3d 963, 968 (8th Cir. 2016) ("In assessing a plaintiff's Article III standing, we must assume that on the merits the plaintiffs would be successful in their claims." (cleaned up and quotation omitted)). The College has a concrete interest in complying with the FHA as interpreted by HUD. Notice and comment rights would have helped ensure the College was "treated with fairness and transparency after due consideration and industry participation." *See Iowa League of Cities*, 711 F.3d at 871. It is plausible at this stage to conclude this notice and comment right was designed to protect this concrete interest. The College therefore plausibly pled both that it suffered an injury in fact and that HUD's failure to follow proper notice and comment procedures caused this injury.

The College also meets the lower showing required for redressability. A party deprived of its notice and comment right, as here, "can assert that right without meeting all the normal standards for redressability and immediacy." *Id.* (quoting

*Lujan*, 504 U.S. at 572 n.7). Redressability in such cases is satisfied "if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Id.* (quoting *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)). The harmed party, however, need not "show that the agency would alter its rules upon following the proper procedures." *Id.* Here, the College shows "some possibility" that enjoining the Memorandum's enforcement would prompt HUD to reconsider the Memorandum.

The College thus has standing because, if nothing else, it was deprived of its opportunity for notice and comment. I would therefore reverse the district court's dismissal of the College's complaint.

_____